IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-593

No. COA21-755

Filed 6 September 2022

Durham County, Nos. 18-JT-1, 18-JT-2

IN THE MATTER OF: M.T. and K.T.

Appeal by respondent-mother from orders entered on or about 13 October 2020

and 5 July 2021 by Judge Shamieka L. Rhinehart in District Court, Durham County.

Heard in the Court of Appeals 9 August 2022.

*Miller & Audino, LLP, by Jeffrey L. Miller, and Elizabeth Simpson, for appellant-respondent mother.*

*Michelle FormyDuval Lynch and Matthew D. Wunsche, for appellee guardian ad litem.*

*The Law Office of Derrick J. Hensley, PLLC, by Derrick J. Hensley, and Elizabeth P. Kennedy-Gurnee for appellee-petitioner Durham County Department of Social Services.*

*Jaclyn Maffetore, for Amicus Curiae The ACLU of North Carolina Legal Foundation.*

*Kathleen Lockwood and Nisha Williams, for Amicus Curiae North Carolina Coalition Against Domestic Violence.*

*Laura Holland, Quisha Mallette, and Sarah Laws, for Amici Curiae North Carolina Justice Center and North Carolina Community Bail Fund of Durham.*

*Tin, Fulton, Walker & Owen, PLLC, by Abraham Rubert-Schewel, for Amicus Curiae North Carolina NAACP.*

STROUD, Chief Judge.

All cases involving abuse, neglect, and dependency of children or termination of parental rights arising from physical abuse of a baby are tragic; cases arising from serious and life-threatening non-accidental injuries to a baby are perhaps the most challenging and tragic of all. Here, as in most cases involving life-threatening non-accidental injuries to a baby, there is no direct evidence of exactly what happened. A baby cannot tell anyone what happened, and no one, other than someone who hurt the baby, saw what happened. Trial courts must often make these difficult and momentous decisions based upon circumstantial evidence and evaluation of credibility and weight of the evidence. In this case, the trial court carefully considered evidence from many witnesses and hundreds of pages of exhibits and reports, including medical records, presented at hearings held over many days. The trial court entered several orders over four years and ultimately entered an order of termination of parental rights, setting out the facts about the abuse, the parents, and the children in thoughtful and careful detail. The trial court also painstakingly considered the best interests of the children before deciding that under the law, Mother's parental rights must be terminated.

In addition to the difficult issues regarding the abuse of the baby, we note several organizations have filed amicus, or "friend of the court," briefs to present

arguments regarding larger issues they contend this case presents. Those briefs address issues including: the "disproportionate and negative impact of the child welfare system on marginalized racial groups;" the "role of race in the proceeding;" the concern that "responses to domestic violence in the child welfare system" may create greater trauma for the children; and the effects of "wealth-based pre-trial incarceration" on families. We do not discount any of the concerns presented by Amici, but as an appellate court, we can address only the issues presented by the facts of this case and the law as established by the General Assembly and prior caselaw. The trial court's job, ultimately, is to make hard decisions based upon the evidence presented, with the best interests of these two young children, Mark and Ken,[1] as its primary consideration. And our job, as an appellate court, is to determine if the trial court did that job correctly, in accord with the law. Because the trial court did that difficult job correctly, we affirm the trial court's order.

Respondent Mother appeals from the trial court's order ceasing reunification in an abuse, neglect, and dependency proceeding and from its order terminating parental rights as to both her children Ken and Mark.[2] After granting Mother's Petition for Writ of Certiorari ("PWC") to review the trial court's order ceasing

---

[1] We use stipulated pseudonyms to protect the identity of the minor children.
[2] The same orders ceased reunification efforts with Father and terminated his parental rights, but Father does not appeal.

reunification, we determine the trial court did not abuse its discretion because it made a reasoned decision based on its Findings regarding Mother's progress on her case plan and the still unexplained nature of some of Ken's injuries and conditions that led to the abuse and neglect proceeding. Because competent evidence supports the trial court's Findings of Fact and those Findings support the trial court's Conclusions of Law, the trial court properly adjudicated termination of Mother's parental rights on the grounds of neglect as to both Mark and Ken and on the grounds of abuse as to Ken pursuant to North Carolina General Statute § 7B-1111(a)(1) (2019). Because we conclude the abuse and neglect grounds were proper, we do not address the other ground for termination, willful failure to make reasonable progress under North Carolina General Statute § 7B-1111(a)(2). Finally, because the trial court made a reasoned decision in excluding testimony from one of Mother's experts at the dispositional phase of the termination proceeding, the trial court did not err on those grounds. We therefore affirm.

## I. Background

¶ 4          On or about 5 January 2018, Durham County Department of Social Services ("DSS") filed a juvenile petition alleging Ken and Mark were neglected and dependent and that Ken was abused. The petition arose from a report of medical neglect in early December 2017 after Ken, who at that time was under six months old and had only been home from the hospital a short time following his premature birth, was taken

to the emergency room and diagnosed with "a head bleed, seizures and possible blood loss in the abdomen." At the time, Ken's "prognosis was unclear." According to the petition, further testing revealed Ken had "skull fractures, rib fractures in various stages of healing and retinal hemorrhages in both eyes" that "[a]ccording to the medical team" were "significant head injuries from non-accidental trauma consistent with physical abuse." As a result of those injuries, at the time the petition was filed, Ken still "require[d] twenty-four hour care, three medications, numerous follow-up medical appointment[s,] . . . therapies," and "monitoring for a blood clot in his leg." Finally, the petition noted while the perpetrator of the abuse had not been identified "[t]he parents were the sole care providers of the children and could not offer any explanation" for Ken's injuries such that his "risk of further injury . . . [was] too great."

¶ 5        While the petition noted Mark had "no special needs or identified injuries," it alleged he was neglected because he "live[d] in an injurious environment due to the abuse and neglect of his sibling" Ken. As a result, DSS sought nonsecure custody of both children, which the trial court granted the same day.

¶ 6        On 25 June 2018, following a hearing held the same day, the trial court entered an order adjudicating Ken abused, dependent, and neglected and adjudicating Mark neglected based on stipulated Findings of Fact made with clear and convincing evidence. The trial court found Ken had been born prematurely, was released from the hospital in early November 2017 and twice had medical appointments in

November where no one noted concerns for unexplained injuries. The trial court also recounted the parents taking Ken to the ER for "changed behavior" including "lack of crying, and voiding for two days, and foot jumping, and twitching, cranky and decreased eating for one day." The Findings then expanded upon the extent and "life-threatening" nature of Ken's injuries and conditions when presented at the hospital on 3 December 2017 that led to the DSS report:

> 12. The Emergency Department sought a CANMEC [a child abuse evaluation] consult for initial concerns for medical neglect due to the delay in seeking treatment, concern for malnutrition, and possible head trauma. The child, [Ken], received immediate critical care treatment for imminent or life-threatening deterioration of the following conditions: endocrine crisis, metabolic crisis, shock, trauma, central nervous system failure or compromise and respiratory failure for status epilepticus, profound anemia and profound hypoglycemia. His body temperature was 94 degrees. He was intubated. He was admitted to the hospital where he remained until December 30, 2017.

The trial court also found diagnostic testing revealed Ken's additional injuries listed in DSS's initial petition as well as "brain injuries due to trauma and oxygen loss." The trial court further found, consistent with the petition, Ken required twenty-four hour care and multiple medications with "[t]he long term consequences of his injuries . . . unknown."

¶ 7        After recounting Ken's injuries, the trial court made Findings related to possible causes. Ken's medical providers ruled out "genetic or medical causes for the

injuries" and determined they were "consistent with non-accidental or inflicted trauma on one or multiple occasions with at least the occurring [sic] between" the period when Ken had his last medical appointment and when he was taken to the hospital. A child abuse expert not affiliated with the hospital reviewed and "concur[red]" with the findings Ken "clear[ly]" suffered abuse and "probabl[y] experienced neglect and medical neglect." The trial court found—again in a Finding stipulated to by both parents—during this period of time when Ken's injuries were caused, "[t]he parents were the sole care providers," and, despite being "informed of the medical findings on several occasions," they "could not or would not offer any explanation for the child's injuries." Specifically, the parents "both den[ied] inflicting any non-accidental trauma and [were] unaware of any event that may have caused the injuries alleged," but they "reviewed the medical evidence" and consented to the Findings to show "their willingness to cooperate with" DSS and the court.

¶ 8     Beyond the Findings on Ken's injuries and potential causes, the trial court noted Mark "has no special needs or identified injuries" although "due to back and forth over consent from the parents" a diagnostic test for injuries was not "timely . . . completed." Following Ken's admission to the hospital and DSS's subsequent involvement, Mark was placed with his maternal grandparents, but that placement only lasted about a month before Father's "disruptive behavior" and the grandmother's health made it "no longer viable." As such, no relative placement was

available for the children.

Based on these Findings, the trial court concluded Ken was abused, neglected, and dependent and Mark was neglected. The trial court then entered an order adjudicating the same.

After a hearing that immediately followed the abuse, neglect, and dependency adjudication, the trial court entered a disposition order on 28 August 2018. After incorporating its adjudication order Findings, the trial court noted how still "[n]o one ha[d] come forth and provided an explanation as to how [Ken] was injured." The trial court also found Mother did not believe the grandparents had injured Ken when they had cared for him previously. The parents told the social worker they believed Ken was injured while at the hospital following his premature birth, but Mother had taken Ken for doctor appointments after his initial discharge and "no medical concerns" were noted either time. The trial court further found the parents' belief the hospital caused the injuries was "unreasonable" and "perplex[ing]" since two separate experts in child abuse, including an expert retained by the parents for a second opinion, opined the injuries were "non-accidental" and sustained during a period of time when the parents were sole caretakers.

In its remaining Findings in the disposition order, the trial court addressed: Mother's care for Ken in the relevant time period, parents' "pattern of refusing medical treatment for both" Mark and Ken, the lack of viability of potential relative

placements, a text message Father sent while high saying "When I'm not high I'm a very negative, abusive and ugly person," parents' employment and engagement with services, and DSS's recommendations and reasonable efforts. The trial court then made ultimate Findings that it was contrary to the children's best interests to be returned home because of (1) the lack of explanation as to how Ken sustained his multiple injuries and (2) the risk from "[t]he parents' pattern of refusing medical treatment."

¶ 12        Based on these Findings, the trial court concluded DSS made reasonable efforts; it was in the children's best interests that DSS have legal custody and placement authority; and the parents should engage in services to remediate the cause of the adjudication and have only supervised visitation. The trial court then granted DSS legal custody and placement authority with supervised visitation for the parents; DSS also would "continue to explore potential kinship placements and continue to make reasonable efforts to reunify the family." The trial court also ordered both Mother and Father to engage in the following services: "[a]] submit to a comprehensive Parenting Capacity Assessment, follow the recommendations of the assessment; [b)] complete a parenting class and demonstrate that the children will be physically safe in [their] care; [c)] demonstrate during visitation what is learned in parenting classes; [d)] submit to random drug screens." As part of these services, the trial court ordered their "therapy is not to be solely about their feelings related to

the loss of the children. The Court has questions about what happened to [Ken] which should be explored in therapy."

¶ 13      Over the following two years, the trial court held three review and permanency planning hearings that produced three orders. We only recount the relevant portions from the first two orders because they are not at issue in this appeal. In the final of the three permanency planning orders, the trial court ceased reunification efforts. Since Mother challenges the trial court's decision to cease reunification efforts in her appeal, we review that order in more detail.

¶ 14      The trial court entered its first review and permanency planning order on 12 April 2019 following hearings on 19 February and 21 March of that year. In relevant part, the trial court first found both parents had been in jail since November 2018 "on charges arising from the injuries [Ken] received" and had "been unable to post bond or to engage in services." The trial court also made Findings about a new explanation Mother gave for Ken's injuries. Specifically, Mother testified her stepfather had abused her and he had access to Ken. The trial court rejected this explanation, finding the stepfather causing Ken's injuries was "contrary to what [Mother] stipulated to" in the adjudication order and contrary "to the established window of the occurrence of the injuries." The trial court also "question[ed]" why Mother had previously suggested her stepfather and mother (i.e. the maternal grandparents) to DSS as people who could take the children pursuant to a safety plan. As a result, the

trial court expressed its "continue[d] . . . concern[] that there is no plausible explanation for the injuries" because the parents were the only caretakers during the time period the court had found the injury was sustained. The trial court then found the children could not be returned to either parent "as there [was] still no credible explanation for how [Ken] was injured and the parents remain[ed] incarcerated."

¶ 15    After making Conclusions of Law about DSS's reasonable efforts and the children's best interests, the trial court ordered DSS would retain custody and placement authority and the parents would have visitation with Mark "as long as it [was] not contraindicated by his behavior" and no visitation with Ken while incarcerated, with supervised visitation to resume if they were released from jail. The trial court set the permanent plan as adoption with a secondary plan of reunification and tertiary plan of guardianship. The trial court finally ordered the parents engage in the same services as in its initial disposition order with DSS to "determine what, if any, services can be accessed in the jail and make referrals, if possible."

¶ 16    The trial court entered its second review and permanency planning order on 22 November 2019 following a hearing on 11 September 2019. In relevant part, the trial court first found the parents "were recently released" from jail on the charges related to Ken's injuries. Specifically, Mother had been released in July 2019. The trial court expressed its "continue[d] . . . concern[] that there is no plausible

explanation for [Ken's] injuries" and that neither Mother nor Father knew "how and why [Ken] sustained his injuries." Finally, the trial court found the parents had stopped visiting with Mark while incarcerated because they did not want him "to see them behind the glass." In this regard, the trial court also noted Mark "act[ed] out in daycare" following a visit with Mother at the jail. His "concerning and disruptive . . . behavior" continued following visits after Mother's release from jail.

¶ 17        After entering Conclusions of Law on DSS's reasonable efforts and the best interests of the children, the trial court ordered DSS would continue to have legal custody and placement authority. The trial court also suspended visitation for both parents and would reevaluate visitation based on "medical and mental health records . . . as well as updated information as would normally be available in [a] full permanency planning review hearing." Finally, "[a]ny and all provisions of the previous order not inconsistent with" the instant order would remain in effect, including that the parents engage in the previously-ordered services.

¶ 18        On or about 13 October 2020, the trial court filed the third and final permanency planning review order following hearings held on 10 February and 6–7 July 2020; the hearing was not completed until July 2020 because of an extended

adjournment due to the COVID-19 pandemic.[3] To separate this order from the prior permanency planning orders, as relevant to Mother's appeal of this order, we refer to this order as the October 2020 Order.

¶ 19 In the October 2020 Order, the trial court made numerous Findings of Fact based on clear, cogent, and convincing evidence. First, the trial court recounted the evidence and testimony it reviewed, DSS's "reasonable efforts" at relative placement, and the current well-being of the two children with their current placement determining it was in their best interest to remain in that placement. The trial court then addressed the history of the children's adjudication, incorporating and "re-iterat[ing]" some Findings from that order. Further, the trial court made updated Findings about the still-pending felony charges both parents faced as a result of Ken's injuries, Mother's release from jail, and how Mother believed her criminal charges were in the "process of being deferred." As part of this summary of pending charges, the trial court found Father had a pending assault by strangulation charge, in which Mother was the victim. Related to that incident, the trial court made Findings on the history of domestic violence Father perpetrated against Mother including that

---

[3] Orders of the Chief Justice of the North Carolina Supreme Court postponed most in-person court proceedings between 13 March and 1 June 2020. *See* Order of the Chief Justice Emergency Directives 1 to 2 (13 Mar. 2020) (postponing for 30 days); Order of the Chief Justice Emergency Directives 1 to 7 Postponing Court Proceedings Until June 1 (2 April 2020).

Mother "desire[d] to file a permanent domestic protective order but" had not done so and that Father had not threatened or physically abused Mother prior to the children coming into DSS care.

¶ 20    As part of recounting the case history, the trial court reiterated the four services Mother was ordered to undertake:

> a) submit to a comprehensive Parenting Capacity Assessment, follow the recommendations of the assessment;
> b) complete a parenting class and demonstrate that the children will be physically safe in her care;
> c) demonstrate during visitation what is learned in parenting classes;
> d) submit to random drug screens

It then made a Finding about Mother's progress on the services explaining Mother completed some parenting programs, tested negative on a random drug screen, and completed a parental capacity assessment. Mother had a no-contact order with Ken, and the trial court suspended her visitation in the previous order. Later, the trial court found the parenting class's "safety information was limited to childproofing the home and discussion of child health as in what to do if the child is sick or injured." The trial court also found the parental capacity evaluation failed to adequately address a referred question relating to the continued lack of explanation for Ken's injuries.

¶ 21    The trial court made extensive findings regarding the continued lack of

explanation for Ken's injuries. First, the trial court noted an email from Father to the social worker in May 2020 in which Father said "When [Ken] came home I actually dropped him on accident. He landed very hard on the floor and immediately started seizing. I was so scared I didn't know what to do. [Mother] wasn't home. I had been smoking and drinking . . . and yea, that's what happened." (Ellipses in original.) The trial court then made findings about how Mother had learned about the email and noted she "believes" Father caused Ken's injuries but "did not ask any further questions" such that "the court observed no curiosity from the [M]other to find out what happened or more about the [F]ather's disclosure." The trial court also found the social worker told the original hospital evaluators about Father's statement and they did not change their original opinion of abuse because "this new information does not explain all of [Ken]'s symptoms and injuries."

¶ 22        As a result of this evidence and the trial court's credibility determination about Father's email, the court made numerous Findings on its continuing concerns about the lack of explanation for Ken's injuries and conditions. For example, the trial court explained none of the versions of events presented to it "explain [Ken]'s poor state of health at the time he was presented . . . to include being malnourished and having skull fractures, retinal hemorrhages and other fractures of differing ages."

¶ 23        In its final relevant Findings, the trial court determined reunification efforts "would clearly be unsuccessful and inconsistent with the minor children's health or

safety" in part because of the continued lack of explanation of Ken's injuries and the varied explanations over time. The trial court also found DSS made reasonable efforts and visitation was not in the children's best interests.

¶ 24 Based on these Findings, the trial court concluded it was in the children's best interests for DSS to retain legal custody and placement authority, visitation to be suspended, and Mother to complete the services previously ordered. It also concluded reunification efforts with Mother and Father "would be clearly unsuccessful and inconsistent with the minor children's health or safety" such that DSS was relieved of further reunification efforts and the primary permanent plan would be adoption with a secondary plan of guardianship. Finally, the court concluded it was "in the children's best interests that . . . DSS file a proceeding to terminate parental rights within sixty (60) days of this hearing." The court entered an order that aligned with its Conclusions of Law and specifically restated the services Mother needed to undertake to "correct the conditions" that led to the children's adjudication.

¶ 25 As ordered to by the later filed written order entered on or about 13 October 2020, DSS filed a "Motion and Petition for Termination of Parental Rights" on 13 July 2020. (Capitalization altered.) After recounting the past proceedings as laid out above, DSS alleged the following as grounds for terminating Mother's parental rights:

> a. The [M]other has abused and/or neglected the children, and the children are neglected and abused children within the meaning of G.S. 7B-101 (1) and (15). The children have

been previously adjudicated neglected and/abused, have been previously neglected and/or abused, and there is a reasonable likelihood of neglect if they were returned to the [M]other.

b. The [M]other has willfully left the children in foster care for more than twelve (12) months without showing to the satisfaction of the Court that reasonable progress under the circumstances has been made within twelve (12) months in correcting those conditions which led to the removal of the children.

c. The children have been placed in the custody of . . . DSS and the [M]other, for a continuous period of six (6) months next preceding the filing of the petition, has willfully failed for such period to pay a reasonable portion of the cost of care for the children although physically and financially able to do so.

d. The [M]other has committed murder or voluntary manslaughter of another child of the parent or other child residing in the home; has aided, abetted or voluntarily solicited to commit murder or voluntary manslaughter of the child, another child of the parent, or other child residing in the home; has committed felony assault that results in serious bodily injury to the child, another child of the parent, or other child residing in the home, or has committed murder or voluntary manslaughter of the other parent of the child.

Mother filed an answer 11 August 2020.

The trial court held hearings on the termination of parental rights in May 2021. It heard extensive testimony, over five days, during both the adjudication and disposition stages of the proceedings. As relevant to the issues on appeal, Mother called Dr. Jessica Pryce as a witness during the disposition phase; she was "tendered and accepted as an expert in child welfare policy and practice." According to her

proffered report, Dr. Pryce sought to testify about racial disparity and disproportionality in child welfare systems, domestic violence and such systems, and evidence about the importance of avoiding family separation based upon research about the long term impact of foster care versus kin placement. During some foundational testimony, both DSS and the Guardian ad Litem ("GAL") objected to Dr. Pryce's testimony on grounds including lack of foundation and relevance. After extended voir dire and arguments from the parties on whether the expert should be allowed to testify, the trial court excluded the testimony because it was "irrelevant." Mother's counsel then submitted the expert's report as an offer of proof.

¶ 27 Following these hearings, on or about 5 July 2021, the trial court entered an order terminating parental rights. Within the order, the trial court included sections on both adjudication and disposition.

¶ 28 For the adjudication order, the trial court made Findings of Fact by clear, cogent, and convincing evidence. First, the trial court took judicial notice of its prior orders and made a number of Findings related to jurisdiction and procedural matters. It then recounted the original removal of Mark and Ken from their home, incorporating most of the Findings stipulated to in the abuse, neglect, and dependency adjudication order. The trial court further recounted its initial disposition order Findings as well as the four services it ordered Mother to undertake "to remediate or remedy behaviors or conditions which led or contributed to the

children's adjudication or the Court's decision to remove custody of the children" from her. Lastly as to the pure procedural history, the trial court recounted relevant parts of its first two review and permanency planning orders including the parents' changing explanations, the court's continued concern about the lack of explanation for Ken's injuries, and the need for services to redress that lack of explanation.

¶ 29 The trial court then made updated Findings on Mother's compliance with the services it had previously ordered. After incorporating its Findings from the October 2020 Order, the trial court determined "there [was] no change of circumstances" as to the parental capacity evaluation and reiterated the initial evaluation "failed to fully, objectively and adequately address the conditions that led to the removal of the children from the home." Similarly, the trial court found Mother still had not "engaged in any parenting class which fully and completely addressed the medical and safety reasons that the child [Ken] came into care." Overall, the trial court determined Mother "participated in services that do not address the reason the children came into care."

¶ 30 The trial court also made numerous Findings on the continued lack of explanation for Ken's injuries and its attempts to receive one. First, the trial court incorporated many of its Findings from the October 2020 Order. Then, the trial court explained how Father's email explanation "has no weight and there is no credibility to it," although in the wake of the email, Father pleaded guilty to child abuse charges

and the prosecutor voluntarily dismissed Mother's charges. The court found, though, Mother believed Father's email and had no explanation "for each of [Ken]'s conditions" when he arrived at the hospital. After noting that the parents were Ken's sole caretakers in the relevant period, the trial court addressed testimony from two medical experts in child abuse pediatrics, including one who was Mother's expert; both experts determined Ken's injuries were the result of non-accidental trauma and were not explained by the events described in Father's email. The trial court noted it had "pleaded and begged for information as to what happened to" Ken but it remained unexplained.

¶ 31    Finally, the trial court made Findings on the history of domestic violence perpetrated by Father against Mother, finding there was no domestic violence before the removal of the children from the home, and a series of ultimate Findings as to the grounds for termination alleged in the petition. As to the neglect ground, the trial court found a "likelihood of repetition of neglect and abuse" because of the continued lack of explanation for Ken's injuries and Mother and Father's "failure to adequately and timely address the issues that led to the removal of the juveniles from the home." As to the willfully leaving the children in foster care ground, the trial court found the children had been in foster care for over twelve months and Mother and Father "willfully failed or refused" to "complete court ordered services" in that neither had made "reasonable progress under the circumstances to correct the conditions that led

to the juveniles' removal."

¶ 32        Based on those Findings, the trial court entered adjudication Conclusions of Law, determining grounds existed to terminate Mother and Father's parental rights for abuse as to Ken and neglect as to Ken and Mark under North Carolina General Statute § 7B-1111(a)(1) and for willfully leaving the juveniles with DSS for over 12 months and willfully failing to make reasonable progress in correcting the conditions that led to the children's removal from the home under North Carolina General Statute § 7B-1111(a)(2).  The trial court also concluded the additional ground of committing a felony assault inflicting serious injury applied only to Father, not Mother.  DSS chose not to proceed on the other ground in the petition, so the trial court concluded it was not established.

¶ 33        Having found grounds to terminate parental rights, the trial court proceeded to the dispositional phase.  After incorporating all the adjudication Findings, the trial court made additional Findings on the children's current placement, the "strong likelihood of adoption" in that placement, the bond with the parents, and the bond with the "potential adoptive parents."  The trial court then concluded it was in the best interest of the children that the parents' rights be terminated.  The trial court then entered an order terminating Mother and Father's parental rights, giving legal and physical custody with placement authority to DSS, and directing DSS to "continue to follow through with the adoption process."

Mother filed written notice of appeal from the order terminating parental rights to our Supreme Court, with appeal to this Court as an alternative given a then-recent change in law, on 14 July 2021. She filed an amended notice of appeal of the same order to this Court on 23 July 2021.

## II. Legal Background and Issues Presented

To help better situate Mother's arguments, we start by giving a brief background of juvenile proceedings around abuse, neglect, and dependency as well as termination of parental rights.

Parents have a constitutional right to "custody of their child and to determine the care and supervision suitable for their child." *In re Montgomery*, 311 N.C. 101, 106, 316 S.E.2d 246, 250 (1984) (citing *Santosky v. Kramer*, 455 U.S. 745, 758–59, 71 L.Ed.2d 599, 610 (1982)). "The constitutional parental right is, of course, not absolute." *In re E.B.*, 375 N.C. 310, 315–16, 847 S.E.2d 666, 671 (2020) (citing *In re C.B.C.*, 373 N.C. 16, 19, 832 S.E.2d 692, 695 (2019)). But it is a "fundamental liberty interest which warrants due process protection." *Id.*, 375 N.C. at 316, 847 S.E.2d at 671 (quoting *In re Montgomery*, 311 N.C. at 106, 316 S.E.2d at 250 (internal quotations and citations omitted)).

Juvenile abuse, neglect, and dependency proceedings and termination of parental rights proceedings include specific statutory procedures to provide such due process protections. *See* N.C. Gen. Stat. § 7B-100 (2021) (directing courts to interpret

and construe abuse, neglect, and dependency and termination of parental rights statutes "[t]o provide procedures for the hearing of juvenile cases that assure fairness and equity and that protect the constitutional rights of juveniles and parents"); *see also, e.g., In re Montgomery*, 311 N.C. at 114–15, 316 S.E.2d at 255 (summarizing statutory protections under termination of parental rights statutes and how they "adequately assure" parents receive "procedural due process protection"); *In re J.C.*, 380 N.C. 738, 2022-NCSC-37, ¶ 6 (explaining "statutory burden of proof by clear cogent, and convincing evidence" provided for in North Carolina General Statute § 7B-1109(f) (on adjudication hearings for terminations of parental rights) "protects a parent's constitutional due process rights as enunciated by" *Santosky*); *In re K.W.*, 272 N.C. App. 487, 491, 846 S.E.2d 584, 589 (2020) (addressing how same statutory burden of proof in abuse, neglect, and dependency proceedings "assure[s] due process of law" (quoting N.C. Gen. Stat. § 7B-802 (2019))); *In re Eckard*, 148 N.C. App. 541, 547, 559 S.E.2d 233, 236 (2002) (discussing parents' constitutional rights in context of abuse, neglect, and dependency hearings).

¶ 38        Turning to the specific statutory procedures that protect parents' constitutional rights, both abuse, neglect, and dependency proceedings and termination of parental rights proceedings follow a two-step process. *See In re K.W.*, 272 N.C. App. at 491, 846 S.E.2d at 589 ("A proceeding to protect an allegedly abused, neglected, or dependent juvenile requires two hearings."); *In re A.W.*, 377 N.C. 238,

2021-NCSC-44, ¶ 34 ("Our Juvenile Code provides for a two-step process for termination of parental rights proceedings consisting of an adjudicatory stage and a dispositional stage." (quoting *In re Z.A.M.*, 374 N.C. 88, 94, 839 S.E.2d 792, 796–97 (2020) (in turn citing N.C. Gen. Stat. §§ 7B-1109, 1110 (2019)))).

¶ 39     Focusing on abuse, neglect, and dependency proceedings first, this Court has recently explained the two steps as follows:

> First, the trial court holds an adjudicatory hearing to determine if a child is abused, neglected, or dependent. [*In re O.W.*, 164 N.C. App. 699, 701, 596 S.E.2d 851, 853 (2003).] At this stage, heightened requirements are in place to "protect the rights of . . . the juvenile's parent" and "assure due process of law." N.C. Gen. Stat. § 7B-802 (2019). The trial court must apply the Rules of Evidence, N.C. Gen. Stat. § 7B-804 (2019), and can find a child abused, neglected, or dependent only if that status is proven "by clear and convincing evidence." N.C. Gen. Stat. § 7B-805 (2019).
>
> If the trial court finds at adjudication that the allegations in a petition have been proven by clear and convincing evidence and concludes based on those findings that a juvenile is abused, neglected, or dependent, the court then moves on to an initial disposition hearing. N.C. Gen. Stat. § 7B-901 (2019). At this stage, the trial court, in its discretion, determines the child's placement based on the best interests of the child. *O.W.*, 164 N.C. App. at 701, 596 S.E.2d at 853.

*In re K.W.*, 272 N.C. App. at 491, 846 S.E.2d at 589 (alterations in original). Following the initial disposition hearing and order, the trial court continues to conduct review or permanency planning hearings. *See* N.C. Gen. Stat. § 7B-906.1 (eff. 1 Oct. 2021)

(mandating court conduct such hearings with certain required components).[4]  At

permanency planning hearings, the trial court must adopt one or more of the listed

statutory permanent plans including, as relevant here, reunification, adoption, and

guardianship.  N.C. Gen. Stat. § 7B-906.2(a) (eff. 1 Oct. 2021); *see also* N.C. Gen. Stat.

§ 7B-906.2(a) (2019) (including same provisions in previous version).  This concurrent

planning "shall continue until a permanent plan is or has been achieved."  N.C. Gen.

Stat. § 7B-906.2(a1) (eff. 1 Oct. 2021); *see also* N.C. Gen. Stat. § 7B-906.2(a1) (2019)

(including same provisions in previous version).

¶ 40        The two-step process for termination of parental rights resembles that of

abuse, neglect, and dependency proceedings:

> In conducting a termination of parental rights proceeding,
> the trial court begins by determining whether any of the
> grounds for termination delineated in N.C.G.S. § 7B-
> 1111(a) exist. *See* N.C.G.S. § 7B-1109 (2019). "At the
> adjudicatory stage, the petitioner bears the burden of
> proving by 'clear, cogent, and convincing evidence' the
> existence of one or more grounds for termination under
> section 7B-1111(a) of the General Statutes." *In re A.U.D.*,
> 373 N.C. 3, 5–6, 832 S.E.2d 698 (2019) (quoting N.C.G.S. §
> 7B-1109(f)). "If a trial court finds one or more grounds to
> terminate parental rights under N.C.G.S. § 7B-1111(a), it

---

[4] Section 7B-906.1 had changes go into effect 1 October 2021, which was after the trial court entered the order terminating parental rights on appeal here, but the changes relevant to our discussion here merely added new language clarifying the difference between permanency planning hearings and review hearings.  *See* 2021 North Carolina Laws S.L. 2021-132, § 1(h) (1 Sept. 2021) (indicating changes to language of § 7B-906.1(a) and then changes to other sub-sections); *see also* 2021 North Carolina Laws S.L. 2021-100, § 10 (6 Aug. 2021) (updating language to reflect difference between permanency planning and review hearings in additional parts of § 7B-906.1).

> then proceeds to the dispositional stage," *id.* at 6, 832
> S.E.2d 698, at which it "determine[s] whether terminating
> the parent's rights is in the juvenile's best interest."
> N.C.G.S. § 7B-1110(a) (2019).

*In re A.E.*, 379 N.C. 177, 2021-NCSC-130, ¶ 13 (alterations in original). Unlike an

abuse, neglect, and dependency proceeding, once the termination of parental rights

proceeding reaches a disposition terminating rights, the trial court does not

undertake further actions. *See* N.C. Gen. Stat. § 7B-1112 (2021) ("An order

terminating the parental rights *completely and permanently terminates* all rights and

obligations of the parent to the juvenile and of the juvenile to the parent arising from

the parental relationship . . . ." (emphasis added)).

¶ 41        Turning to Mother's arguments, they fit within three of the four possible stages

between abuse, neglect, and dependency and termination of parental rights

proceedings. She does not present any arguments as to the abuse, neglect and

dependency adjudication order, to which she consented. Within the abuse, neglect

and dependency disposition stage, Mother argues "[t]he trial court erred in

eliminating reunification as a permanent plan." Turning to the termination of

parental rights adjudication stage, Mother makes three arguments: (1) Findings of

Fact 82–83 and 85–88 are "not supported by the evidence" and the Findings present

other issues; (2) "[t]he trial court erred in terminating Mother's parental rights to

each of her two children based on abuse or neglect"; and (3) "[t]he trial court erred in

terminating Mother's parental rights on the ground she willfully failed to make reasonable progress." Finally, on the termination of parental rights disposition stage, Mother contends "[t]he trial court erred as a matter of law by excluding relevant evidence mandated for consideration" as to "best interest." We review each of Mother's arguments in turn.

### III. Elimination of Reunification as a Permanent Plan

¶ 42        Mother first argues the trial court "erred in eliminating reunification as a permanent plan for Mother." Specifically, she asserts the order eliminating reunification, which we are calling the October 2020 Order, "was not based on sufficient evidence and was not supported by the evidence or findings sufficient to support the conclusion." Then, she contends the court erred for the reasons stated in *In re J.M., N.M.*, 276 N.C. App. 291, 2021-NCCOA-92.

### A. Preservation of Issue for Appeal

¶ 43        Before reaching the merits, we address whether this issue is properly before us. Both GAL and DSS argue Mother failed to preserve her appeal of the October 2020 Order eliminating reunification as a permanent plan. In recognition of her failure to "timely and properly appeal" the October 2020 Order, Mother has filed a petition for writ of certiorari ("PWC") as to the Order and, in the alternative, asks us to use our power under Rule of Appellate Procedure 2 to suspend the Rules of Appellate Procedure as to proper filing of an appeal.

In our discretion, we grant Mother's PWC to allow us to "review the order eliminating reunification together with an appeal of the order terminating parental rights." *See In re C.H.*, 2022-NCSC-84, ¶ 18 (quoting N.C. Gen. Stat. § 7B-1001(a2)) (granting PWC as to orders ceasing reunification and recognizing statute directing this Court to hear such appeals, when properly filed, with order terminating parental rights). Granting a PWC in this situation is appropriate since there is a statutory mandate to vacate an order terminating parental rights "[i]f the order eliminating reunification is vacated or reversed." N.C. Gen. Stat. § 7B-1001(a2) (eff. 1 Oct. 2021). Further, Mother filed a "Notice to Preserve Right of Appeal" of the October 2020 Order; it was merely untimely. (Capitalization altered.) For these reasons and in the exercise of our discretion, we grant Mother's PWC. Because we grant the PWC, we decline to invoke Rule 2.

**B. Standard of Review**

"This Court reviews an order that ceases reunification efforts to determine whether the trial court made appropriate findings, whether the findings are based upon credible evidence, whether the findings of fact support the trial court's conclusions, and whether the trial court abused its discretion with respect to disposition." *In re C.M.*, 273 N.C. App. 427, 429, 848 S.E.2d 749, 751 (2020) (quoting *In re C.M.*, 183 N.C. App. 207, 213, 644 S.E.2d 588, 594 (2007)); *see also In re J.H.*, 373 N.C. 264, 267–268, 837 S.E.2d 847, 850 (2020) (listing same standard of review

in part relying on *In re C.M.*, 183 N.C. App. at 213, 644 S.E.2d at 594). "At the disposition stage, the trial court solely considers the best interests of the child." *In re J.H.*, 373 N.C. at 268, 837 S.E.2d at 850 (quotations and citations omitted). "The trial court's findings of fact are conclusive on appeal if supported by any competent evidence." *Id.*, 373 N.C. at 267, 837 S.E.2d at 850 (quotations and citations omitted). "An abuse of discretion occurs when the trial court's ruling is so arbitrary that it could not have been the result of a reasoned decision." *Id.*, 373 N.C. at 268, 837 S.E.2d at 850 (quotations and citations omitted).

**C. Analysis**

¶ 46        Mother asserts the October 2020 Order "was not based on sufficient evidence and was not supported by the evidence or findings sufficient to support the conclusion" and the trial court erred for the reasons stated in *In re J.M.* Specifically as to *In re J.M.*, Mother argues the October 2020 Order included "numerous findings which confirmed Mother's continuing suitability as a parent entitled to reunification" including her completion of her case plan, "glowing reports" from the "parental capacity expert and the parenting instructor," employment, a new residence, ending her relationship with Father, and "believe[ing] Father's confession that he injured Ken." Mother contends her "only failure was being unable to explain Ken's 2017 injuries to the personal satisfaction of the Judge, which is an insufficient basis to eliminate reunification" under *In re J.M.*

¶ 47 As to the first argument, Mother fails to identify any specific Findings of Fact not supported by the evidence, so she has failed to preserve any challenges to the Findings. *See Dalenko v. Collier*, 191 N.C. App. 713, 719, 664 S.E.2d 425, 429 (2008) (concluding party failed to preserve challenge to findings of fact because she "failed to assign error to specific findings of fact by the trial court, and instead resort[ed] to a broadside attack on the order 'that its finding are not support by pleadings, submissions, evidence of record and arguments of the parties . . .'" (ellipses in original)); *In re Y.I.*, 262 N.C. App. 575, 579, 822 S.E.2d 501, 504 (2018) (determining mother abandoned her challenge to three specifically named findings of fact because she "wholly fail[ed] to support her contention with explanation or citation to the record").

¶ 48 As a result, we only consider Mother's argument the trial court erred based on *In re J.M.* For that argument, we must decide whether the trial court abused its discretion in ceasing reunification efforts based on the best interest of the children. *See In re J.H.*, 373 N.C. at 267–68, 837 S.E.2d at 850 (explaining our courts review orders ceasing reunification for abuse of discretion and that, as with any order at the disposition stage, the trial court only considers the child's best interests).

¶ 49 "At a permanency planning hearing, 'reunification shall be a primary or secondary plan unless,' *inter alia*, 'the court makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's

health or safety.'" *Id.*, 373 N.C. at 268, 837 S.E.2d at 850 (alterations from original omitted) (quoting N.C. Gen. Stat. § 7B-906.2(b) (2019)). The court also "must make findings 'which shall demonstrate the degree of success or failure toward reunification' including:

> '(1) Whether the parent is making adequate progress within a reasonable period of time under the plan.
> (2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.
> (3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.
> (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.'"

*Id.*, 373 N.C. at 268, 837 S.E.2d at 850–51 (quoting N.C. Gen. Stat. § 7B-906.2(d)).

¶ 50    Mother does not argue the trial court failed to make these required Findings, nor could she. As to Mother's case plan and her progress thereon (requirements (1) and (2) above), the trial court recounted the four elements of the case plan including:

> a) submit to a comprehensive Parenting Capacity Assessment, follow the recommendations of the assessment;
> b) complete a parenting class and demonstrate that the children will be physically safe in her care;
> c) demonstrate during visitation what is learned in parenting classes;
> d) submit to random drug screens

The trial court then made findings that Mother completed parenting programs in 2018 and 2019 and submitted to a random drug screen in 2018. In a later Finding,

the trial court noted the program's "safety information was limited to childproofing the home and discussion of child health as in what to do if the child is sick or injured." As to visitation, the trial court noted both parents were subject to a no-contact order with Ken and visitation as to Mark was suspended in September 2019. The trial court specifically found the suspension of visitation "was providently entered and continues to be in the best interest of the children" based on a recommendation from Mark's therapist, since adoption was the primary plan. Further, the trial court noted the parenting coach "ha[d] not observed the parents interacting with their children" since the parenting class. Finally, the trial court found Mother "completed a Parenting Capacity Evaluation," and we will address the court's additional, more specific Findings on the parenting capacity evaluation below when we address Mother's main argument.

¶ 51    As to Mother's availability to the court, DSS, and GAL (requirement (3)), the trial court recounted in numerous Findings Mother's contact with it, DSS, and the GAL. For example, the trial court noted how Mother had attended a previous hearing in April 2020, "maintained sporadic communication with" DSS, and "text[ed] the Social Worker monthly to get updates on the children and to see photos."

¶ 52    As to the final § 7B-906.2(d) factor, the trial court made multiple Findings regarding Mother acting "in a manner inconsistent with the health or safety of the juvenile." N.C. Gen. Stat. § 7B-906.2(d)(4). For example, the trial court found:

> 63. Reunification efforts with the [M]other and [F]ather would clearly be unsuccessful and inconsistent with the minor children's health or safety, because: there is still no explanation as to how [Ken] was injured and how he came to be in the state of health as presented on December 3, 2017 despite the various accounts and the case pending for more than two (2) years. The [F]ather's account of one sole incident is inconsistent with the injuries which were of different ages according to the medical evidence previously adduced by this court. Further reunification efforts with [M]other or [F]ather would be unsuccessful and inconsistent with the health and safety of both children based on the parents' inability to provide a safe, stable and secure home free of domestic violence and substance use. The Court finds that the safety risk to [Mark], as a child in the home of the abused sibling, continues to be great based on the lack of forthright explanation by the parents, as well as the minimized domestic violence and substance abuse issues.

The trial court's previous Findings made clear it was referring to Father when discussing the substance abuse issues and perpetration of the domestic violence, at least as against Mother.

¶ 53        Mother argues the trial court erred in eliminating reunification because she "completed her case plan," received "glowing reports" from her parental capacity expert and parenting instructor, and only failed "to explain Ken's 2017 injuries to the personal satisfaction of the Judge, which is an insufficient basis to eliminate reunification" under *In re J.M.* We conclude the trial court did not abuse its discretion in ceasing reunification efforts because it made a "reasoned decision" that Mother had not completed her case plan and it properly considered Mother's lack of

explanation as to Ken's 2017 injuries. *See In re J.H.*, 373 N.C. at 268, 837 S.E.2d at 850 (explaining an abuse of discretion only occurs when trial court's ruling "could not have been the result of a reasoned decision").

First, Mother's summary of her case plan progress does not align with the trial court's unchallenged Findings of Fact. Specifically, while Mother emphasizes the parental capacity expert's evaluation and the parenting instructor's feedback, the trial court made numerous Findings explaining why it gave reduced weight to this evidence.

As to the parental capacity evaluation, the trial court explained:

> 58. Both parents underwent a Parenting Capacity Evaluation by April Harris Britt and Dr. Harris Britt testified in this matter as to her findings on February 10, 2020.
>
> 59. The court thoroughly reviewed the Parenting Capacity Evaluations. *There were three referral questions as follows: First, " [parents] [have] some parenting capacity; however, it is concerning that [they] [are] not willing to disclose what happened to [Ken]. Can [they] parent effectively and meet his* [sic] *child's needs?"* Second, "Is [parent] willing and able to keep [his/her] children safe from harm" and third, "Is [parent] able to provide and care for [his/her] children without relying on significant others for support".
>
> 60. The complete medical records from [the hospital] were provided for [Mark] and [Ken] by DSS to Dr. Harris-Britt but her report states that they "could not be reviewed as the disc was password protected". On the other hand, Dr. Harris Britt did review medical records of Dr. Michael Holick and Dr. Daniel Ostrovsky as to causation of [Ken]'s

injuries. In fact, she did review Petitioner's Exhibit #6 which is the letter that summarizes the care and condition of [Ken]. This letter is clear that [Ken] was in poor health when he was presented to Duke Hospital. He was malnourished, had bleeding on the brain and had numerous fractures of different ages, both old and newer. Dr. April Harris-Britt reviewed the court orders in this case. *The Court has a continued concern about what happened to [Ken] because the Court does not have any explanations from either parent at the time of the completion of the PCE. Although Dr. Harris-Britt did not have the entire medical record for [Ken], she formed an opinion that [Mother] can provide safety to her children. Dr. Harris-Britt looked at the previous court orders and the Court has been consistent in articulating its concern of what caused [Ken]'s injuries. This Court is perplexed in how Dr. Harris-Britt didn't believe it was important as to what happened to [Ken] to be factored in her formulating her opinion that [M]other could parent [Ken] and [Mark] safely.* She didn't think she needed to review the Duke medical records in order to assess the parenting capacity of the parents.

61. As for reviewing and considering the orders of this court, Dr. Harris Britt considered the initial Disposition order #11, 12 (Finding of Fact) 13 and 14 most of which were not the salient causation findings regarding the abuse and lack of explanation for the abuse. *This court has been consistently concerned with how [Ken] was injured and the court orders reflect this concern. The first question in the PCE reflects this concern as well.* Dr. Harris Britt concluded that [M]other and [F]ather would be safe parents. This court is perplexed as to how the Duke medical records were not relevant to that assessment.

(Emphasis added; all other alterations in original except changes to names of children, removal of names to protect the children's identity, and "[sic].")

¶ 56        Throughout its Findings on the parental capacity evaluation, the trial court repeatedly emphasized the importance of receiving an explanation for Ken's injuries. The Findings indicate the trial court did not fully credit the evaluation because the evaluation failed to address that important question and did not include a review of records of Ken's injuries. These concerns about the parental capacity evaluations then link directly to the court's ultimate Findings reunification efforts would be unsuccessful and inconsistent with the children's health, safety, and welfare. For example, the trial court emphasized "there is still no explanation as to how [Ken] was injured and how he came to be in the state of health" in December 2017. Thus, the trial court determined the parenting capacity evaluation Mother received did not address one of the questions the trial court noted as a reason for the referral and therefore did not credit the evaluation.

¶ 57        In addition to its concerns about the parenting capacity evaluation, the trial court questioned whether the parenting class adequately addressed the reasons the children were removed from the home as required by the case plan. Specifically, the trial court found the parenting class's "safety information was *limited* to childproofing the home and discussion of child health as in what to do if the child is sick or injured." (Emphasis added.)

¶ 58        The trial court's questioning of the parental capacity evaluation and parenting class is important because it undermines Mother's argument she completed her case

plan and thus the only reason for the cessation of reunification efforts was her failure to explain the injuries. A trial court can consider failure to make adequate progress on a case plan when determining whether to cease reunification efforts. *See* N.C. Gen. Stat. § 7B-906.2(d)(1) (requiring a trial court to make Findings on whether the parent is making "adequate progress within a reasonable period of time under the plan" at permanency planning hearings); *see also In re J.R.*, 279 N.C. App. 352, 2021-NCCOA-491, ¶¶ 33, 37 (finding credible evidence the mother was "not making adequate progress within a reasonable time under case plan" and then determining that finding and others "support the trial court's cessation of reunification efforts"). As long as the trial court's view of the evidence is reasonable, it is binding on appeal even if that view is contrary to a party's characterization of the evidence on appeal. *See In re L.R.L.B.*, 377 N.C. 311, 2021-NCSC-49, ¶ 26 (finding binding on appeal a trial court's "contrary evaluation" of whether a mother made adequate progress by engaging with certain services because the trial court's view was reasonable based on the evidence). Thus, the trial court's questions about the evaluation and parenting class help demonstrate it made a reasoned decision, and thus did not abuse its discretion, in ceasing reunification efforts.

¶ 59          Turning to the trial court's emphasis on the lack of explanation for Ken's injuries directly, the trial court did not abuse its discretion in ceasing reunification efforts on those grounds. As an initial matter, we note Mother relies on *In re JM*, 276

N.C. App. 291, 2021-NCCOA-92, and our Supreme Court granted discretionary review of that decision after the parties (and Amici) completed briefing in this appeal. GAL, with support of DSS, filed a motion to "continue oral argument and hold [the] case in abeyance" as a result of the Supreme Court's action, but we denied that motion. (Capitalization altered.) Further, we note Mother's response in objection to GAL's motion argued "the logic and reason and precedent supporting the principles involved in the issues before this Court remain valid and appropriate for arguments" even though *In re J.M.* itself is "stayed by supersedeas pending the Supreme Court's decision."

¶ 60    The trial court made numerous unchallenged Findings of Fact regarding the failure of the parents, and specifically Mother, to explain Ken's injuries "and condition at the time he was presented for treatment," which was key to its ultimate Finding required to cease reunification efforts. Specifically, even after receiving Father's emailed statement from 13 May 2020 that he dropped Ken and Ken "immediately started seizing," the trial court remained "baffled" because "[c]onsidering [Ken]'s numerous injuries . . . the [F]ather's statement does not explain [Ken]'s other conditions (his low temperature, low blood sugar, hypoglycemia and other conditions)." The trial court made that Finding based in part on the unchanged opinions of the doctors who originally evaluated Ken for child abuse: "The Social Worker apprised Dr. Lyndsay Terrell and Dr. Karen St. Claire at [the hospital] about

the [F]ather's statement. The original opinions and diagnosis still stand as this new

information does not explain all of [Ken]'s symptoms and injuries."

¶ 61    The trial court also explained how none of the parents' previous explanations

fully explained Ken's injuries either:

> The Court has been given different versions of events from
> the parents throughout the case to explain [Ken]'s injuries
> and condition when he was presented to [the hospital] on
> December 3, 2017 at the time of the filing of the petition.
> At first, the parents said it was the fault of [hospital]
> providers, as a malpractice allegation. Then, they alleged
> it was the stepfather who caused the injuries. Now there is
> the [F]ather's statement as to a one-time fall occurring
> while the [F]ather was under the influence. None of these
> accounts explain [Ken]'s poor state of health at the time he
> was presented on December 3, 2017, to include being
> malnourished and having skull fractures, retinal
> hemorrhages and other fractures of differing ages. It is
> notable that [Ken] was examined at [the hospital] prior to
> that date, on November 9, 2017, and was found to be at a
> healthy baseline without injury, retinal hemorrhages,
> malnutrition or fractures as demonstrated by the medical
> records in evidence."

Thus, the trial court had ample support for its ultimate Finding about the continued

lack of explanation of Ken's injuries.

¶ 62    The trial court also made certain Findings specific to Mother and her lack of

explanation. While the trial court found Mother "believes that the [F]ather injured"

Ken, the trial court also noted certain inconsistencies with Mother's view of the

events. For example, while Father's email explained Mother was not home when

Father dropped Ken on the floor and Ken immediately started seizing, the trial court

noted:

> The [M]other also claims that the [F]ather was rarely left
> in the home with the children and they were there together
> with the children. The [M]other continues to report that
> she noticed that when she was changing [Ken]'s diaper and
> his upper body was twitching, and he was looking in one
> spot and that is when she decided to take him to the
> hospital. This is at the point where she noticed something
> was not right with [Ken].

The trial court also repeatedly highlighted instances when Mother could have sought

to gain more information but did not.  For example, the trial court found:

> The [M]other gave testimony about her knowledge of the
> [F]ather's emails to the social worker. According [to] the
> [M]other, she was informed by her cousin about the
> [F]ather's emails. *The [M]other did not ask any further
> questions and the court observed no curiosity from the
> [M]other to find out what happened or more about the
> [F]ather's disclosure.* The [M]other contacted her attorney.

(Emphasis added.)

¶ 63        These Findings explain why the trial court "remain[ed] gravely concerned that

*neither parent* is providing the *full picture* on [Ken]'s injuries."  (Emphasis added.)

They also clarify what the trial court believed Mother needed to do to satisfy its

concerns, namely better understand the cause of *all* of Ken's injuries, not just the

ones potentially explained by Father's email admission.

¶ 64        These Findings regarding the lack of explanation for the injuries are a valid

ground on which to cease reunification efforts. In the similar context of termination of parental rights adjudications, which Mother's favored case of *In re J.M.* relies upon, *see In re J.M.*, ¶¶ 29–30 (citing to *In re Y.Y.E.T.*, 205 N.C. App. 120, 695 S.E.2d 517 (2010), before contrasting the facts there to *Y.Y.E.T.*); *Y.Y.E.T.*, 205 N.C. App. at 127–28, 695 S.E.2d at 521–22 (discussing the trial court's attempt to discover the cause of the child's non-accidental injuries under a heading on terminating parental rights), our Courts have found a continued failure to explain children's injuries adequate grounds to find a likelihood of future neglect of the child by a parent.[5] *E.g.*, *In re D.W.P.* 373 N.C. 327, 339–40, 838 S.E.2d 396, 405–06 (2020) (discussing Mother's lack of explanation for her child David's injuries before concluding "Respondent-mother acknowledges her responsibility to keep David safe, but she refuses to make a realistic attempt to understand how he was injured or to acknowledge how her relationships affect her children's wellbeing. These facts support the trial court's conclusion that the neglect is likely to reoccur if the children are returned to respondent-mother's care.").

¶ 65    For example, in *In re Y.Y.E.T.*, this Court found the parents "refusal to accept responsibility for the child's injury indicate[d] that the conditions which led to the

---

[5] We also do not have precedent on cessation of reunification efforts in the context of unexplained injuries that must have been caused by at least one of the two parents given *In re J.M.* is subject to a stay.

child's initial removal from [their] home ha[d] not been corrected." 205 N.C. App. at 129, 695 S.E.2d at 523. In that case, the trial court had been unable to "conclusively determine who was the perpetrator of the injury" but knew the child's injury "was not accidental" and was indicative of child abuse such that "[a]s the child's sole care providers, it necessarily follow[ed] that [the parents] were jointly and individually responsible for the child's injury. Whether each [parent] directly caused the injury by inflicting the abuse or indirectly caused the injury by failing to prevent it, each [parent] is responsible." *Id.*, 205 N.C. App. at 128–29, 695 S.E.2d at 523–24. Based on those facts and a finding the parents were protecting each other, this Court held the trial court "properly determined that the repetition of abuse or neglect [was] probable." *Id.*, 205 N.C. App. at 129, 695 S.E.2d at 523.

¶ 66        Here, similar to *In re Y.Y.E.T.*, the trial court found Ken's injuries were non-accidental and indicative of child abuse. The trial court had already previously found in the stipulated-to adjudication order that Mother and Father "were the sole care providers of the children during the time of the injuries to" Ken. Further, even accepting Father's explanation that he dropped Ken one time, the trial court found numerous other aspects of Ken's condition when he was taken to the hospital remained unexplained. Thus, the trial court could not "conclusively determine" who caused all of Ken's conditions but could still permissibly determine both parents were responsible for Ken's condition either directly or indirectly. *In re Y.Y.E.T.*, 205 N.C.

App. at 128–29, 695 S.E.2d at 522–23.  While the trial court here did not specifically find Mother was protecting Father, it had concerns about the plausibility of Mother's explanations of events and her lack of interest in trying to learn more information about what happened to Ken.  Therefore, we conclude the trial court properly determined reunification efforts would be inconsistent with the children's health or safety based on Mother's failure to fully explain Ken's injuries and condition when admitted to the hospital.

¶ 67        Mother's progress on her case plan does not change our determination.  Parental compliance with a case plan alone is not always sufficient to preserve parental rights.  *See In re L.G.G.*, 379 N.C. 258, 2021-NCSC-139, ¶ 34 (explaining parental compliance with a case plan "does not preclude a finding of neglect" (citations and quotations omitted)).  In the similar best interest context for termination of parental rights, this Court explained, "[P]arents must demonstrate acknowledgment and understanding of why the juvenile entered DSS custody as well as changed behaviors."  *In re Y.Y.E.T.*, 205 N.C. App. at 131, 695 S.E.2d at 524.  For example, in *In re L.G.G.*, the parents "completed substantially all of their case plan but, despite their participation, they have shown that they have not gleaned sufficient insight into why their . . . children came into DSS custody."  *In re L.G.G.*, ¶ 34.  Here, we have addressed how the trial court did not believe the parenting capacity evaluation or the parenting class Mother took part in adequately addressed the

reasons for her children being in DSS custody because they failed to explain or teach Mother to prevent the injuries and conditions Ken had when presented at the hospital. Thus, even with Mother's progress on her case plan, the trial court's reasons for its decision still withstand our scrutiny.

¶ 68 Mother first argues *In re J.M.* supports her positions, but even assuming *arguendo* the case was not subject to a pending appeal to our Supreme Court, we are not persuaded. First, *In re J.M.* is distinguishable from this case for several reasons. The facts regarding the specific injuries to the child in *In re J.M.* are similar in that the child, Nellie, was about four months old when her parents took her to the hospital after she "became completely silent and limp." *In re J.M.*, ¶ 2. At the hospital, a "CAT scan showed an acute subdural hematoma" and additional testing revealed "severe multilayer retinal hemorrhages to both eyes and rib fractures that appeared to be several days old." *Id.*, ¶¶ 2–3. Nellie's doctor determined her injuries "were highly specific for child abuse." *Id.*, ¶ 3.

¶ 69 But aside from the types of tragic injuries involved, *In re J.M.* then proceeds quite differently from this case both procedurally and factually. For example, neither parent was charged with any criminal offense arising from Nellie's injuries, nor did either parent plead guilty to any crime. As relevant to the evidence regarding how the injuries may have occurred and the trial court's evaluation of that evidence, this Court noted in *In re J.M.* that DSS had not conducted a proper investigation of the

injuries, leaving open a question as to whether either parent actually caused the injuries. *Id.*, ¶ 51. Specifically, two older step-siblings, ages 10 and 14, lived in the home with Nellie and her parents, but

> DSS did not interview Respondent-Mother's older two children in the home during their investigation of Nellie's injuries.
> DSS offers no reason why it failed to interview Respondent-Mother's older children. The trial court found, in the adjudication order, Jon and Nellie were under Respondents' exclusive custody and care based on the statements made by the Respondents to social workers and police regarding their care of Nellie. It is unreasonable to presume, however, that parents have eyes on their children at all times. Parents and children must sleep at some point, and presumably, parents must tend to other children or to household needs, allowing for children to be left without eyes-on supervision for some periods of time, no matter how short.
> Pursuant to N.C. Gen. Stat. § 7B-300, DSS is required "to establish protective services for juveniles alleged to be abused, neglected, or dependent. [The p]rotective services shall include the screening of reports, the performance of an assessment using either a family assessment response or an investigative assessment response . . . ." N.C. Gen. Stat. § 7B-300 (2019). This Court in its discretion takes judicial notice that the policies and protocols that guide and govern family assessments and investigative assessments, "CPS Family and Investigative Assessments, Policy, Protocol, and Guidance," ("DSS's Assessment Manual"), are found in North Carolina's Child Welfare Manual published by the North Carolina Department of Health and Human Services. *See* N.C. Gen. Stat. § 8C-1, Rule 201 (2019).
> The "purpose of the [Child Protective Services] Assessment is to . . . determine if . . . [t]he child is safe within the home and, if not, what interventions can be implemented that

> will ensure the child's protection and maintain the family unit intact if reasonably possible." N.C. Dep't of Health & Hum. Servs., *CPS Family and Investigative Assessments Policy, Protocol, and Guidance*, 1 (July 2019), https://policies.ncdhhs.gov/divisional/social-services/child-welfare/policymanuals/modified-manual-1/assessments.pdf.
> DSS can approach an instance of alleged neglect, abuse, and dependency through a "Family Assessment," or "Investigative Assessment. [Footnote]" Both methods require face-to-face interviews with *all children residing in the home*. N.C. Dep't of Health & Hum. Servs., *CPS Family and Investigative Assessments Policy, Protocol, and Guidance*, 64, 69 (July 2019), https://policies.ncdhhs.gov/divisional/social-services/child-welfare/policy-manuals/modified-manual-1/assessments.pdf. (emphasis added).

*Id.*, ¶¶ 46–51 (alterations in original except for footnote removal).

¶ 70 Aside from these factual differences, *In re J.M.* turned on two key facts: (1) the mother there "engaged in all services required of her in order to correct the conditions that led to the removal of the children and that she had objectively learned from and benefitted from the services"; and (2) the mother acknowledged the child's injuries were "nonaccidental" but could not explain the cause of the injuries because she was not present for them. *Id.*, ¶¶ 30–31. As to the first fact, the trial court here found, in a series of unchallenged Findings of Fact, Mother's parental capacity evaluation and parenting class did not correct the conditions of removal because they failed to fully address the still unexplained nature of *all* of Ken's injuries. As to the second fact, while Mother acknowledged Father's email and believed it, the trial court still had

concerns about the plausibility of Mother's explanations of events and her lack of interest in trying to learn more information about what happened to Ken. Given these factual differences from the situation in *In re JM*, the trial court made a reasoned decision in ceasing reunification efforts and thus did not abuse its discretion even when considering that case.

¶ 71      Mother also argues, in her reply brief, the cases on which we rely are distinguishable, albeit in the context of her argument about termination of parental rights adjudication on abuse or neglect grounds. We reject each of her attempts to distinguish the cases. First, Mother argues *In re L.G.G.* is distinguishable because there neither parent would acknowledge the source of the children's "significant sexualized behaviors." Here, the trial court found Mother failed to acknowledge the "full picture" of the extensive injuries and ailments Ken presented when admitted to the hospital could not be explained by Father's admission he dropped Ken once. While the factual scenarios were different, the lack of acknowledgement of all the reasons for DSS involvements were similar. Second, Mother argues *In re Y.Y.E.T.* is distinguishable because here there was "a valid and positive" parental capacity evaluation. As we have laid out above, the trial court made unchallenged Findings of Fact recounting its misgivings about the evaluation here, particularly that the evaluation failed to fully address the still-unexplained nature of *all* of Ken's injuries.

¶ 72      After our review, we conclude the trial court did not abuse its discretion in

ceasing reunification efforts. The trial court made the required Findings of Fact, and it made a reasoned decision in ceasing reunification efforts based on its Findings on Mother's case plan progress and the still unexplained nature of some of Ken's injuries and ailments.

## IV.  Termination of Mother's Parental Rights- Adjudication Issues

¶ 73        Beyond her argument about ceasing reunification at the disposition stage of the abuse, neglect, and dependency proceeding, Mother also argues the trial court erred "in terminating [her] parental rights [as] to each of her two children." As to the adjudication stage of the termination of parental rights proceeding, Mother makes three arguments: (1) Findings of Fact 82–83 and 85–88 are "not supported by the evidence" and present other issues;  (2) "[t]he trial court erred in terminating Mother's parental rights to each of her two children based on abuse or neglect"; and (3) "[t]he trial court erred in terminating Mother's parental rights on the ground she willfully failed to make reasonable progress." After addressing the standard of review at the termination of parental rights adjudication stage, we address each argument in turn.

### A.  Standard of Review

¶ 74        Our Supreme Court has recently described the standard of review for the adjudication stage of termination of parental rights proceedings as follows:

"We review a district court's adjudication under N.C.G.S. §

7B-1111(a) to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re J.S.*, 374 N.C. 811, 814[, 845 S.E.2d 66] (2020) (cleaned up) (quoting *In re N.P.*, 374 N.C. 61, 62–63[, 839 S.E.2d 801] (2020)). "Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re B.R.L.*, 379 N.C. 15, 2021-NCSC-119, ¶ 11, (quoting *In re T.N.H.*, 372 N.C. 403, 407[, 831 S.E.2d 54] (2019)). "A trial court's finding of fact that is supported by clear, cogent, and convincing evidence is deemed conclusive even if the record contains evidence that would support a contrary finding." *In re A.L.*, 378 N.C. 396, 2021-NCSC-92, ¶ 16 (quoting *In re B.O.A.*, 372 N.C. 372, 379[, 831 S.E.2d 305] (2019)). " '[T]he issue of whether a trial court's adjudicatory findings of fact support its conclusion of law that grounds existed to terminate parental rights pursuant to N.C.G.S. § 7B-1111(a)' is reviewed de novo by the appellate court." *In re M.R.F.*, 378 N.C. 638, 2021-NCSC-111, ¶ 7 (alteration in original) (quoting *In re T.M.L.*, 377 N.C. 369, 2021-NCSC-55, ¶ 15). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the trial court." *In re T.M.L.*, 377 N.C. 369, 2021-NCSC-55, ¶ 15 (cleaned up) (quoting *In re C.V.D.C.*, 374 N.C. 525, 530 (2020)).

*In re M.K.*, 2022-NCSC-71, ¶ 12.

## B. Challenged Findings of Fact

Mother first argues Findings of Fact 82–83 and 85–88 are "not supported by the evidence" and present other issues. We review each Finding in turn and determine whether they are supported by clear, cogent, and convincing evidence. *In re M.K.*, ¶ 12.

Mother argues Finding of Fact 82 "is a conclusion of law and not supported by

the evidence as to" her.  Finding 82 recounts:

> At the time of this termination hearing, the Petitioner
> demonstrated by and through the evidence presented that
> the conditions rising to the level of neglect existed during
> the pendency of the termination action. There is no change
> in the safety risk to the children. There continues to be no
> explanation for [Ken]'s injury and medical condition as it
> existed on December 3, 2017. This continues to present a
> significant safety risk for [Mark] and [Ken] should they be
> returned to the care of either parent. Returning these
> children to their parents is a risk that this court cannot
> afford to take. There is a likelihood of repetition of neglect
> and abuse if the juveniles were returned to the home of the
> Respondents based upon the findings of fact herein.

¶ 77     Mother attempts to argue both this is a Conclusion of Law and is not supported

by the evidence, which is the standard of review we apply to Findings of Fact.  *In re*

*M.K.*, ¶ 12.  But we "are obliged to apply the appropriate standard of review to a

finding of fact or conclusion of law, regardless of the label which it is given by the

trial court," *In re J.S.*, 374 N.C. at 818, 845 S.E.2d at 73, so we must determine

whether this is a Finding or Conclusion.  While in the past this Court and our

Supreme Court have "characterized . . . grounds for termination as both an 'ultimate

finding' and a 'conclusion' of law," we treat discussions of the grounds for termination

as conclusions of law. *See In re D.A.A.R.*, 377 N.C. 258, 2021-NCSC-45, ¶ 38 (applying

conclusion of law standard of review to a ground for termination).  The evidence of

neglect and the likelihood of repetition of neglect and abuse relate directly to the

ground for termination in North Carolina General Statute § 7B-1111(a)(1).  *See* N.C.

Gen. Stat. § 7B-1111(a)(1) (2019) (permitting termination of parental rights on the ground the parent "has abused or neglected the juvenile"); *In re L.G.G.*, ¶ 20 ("Termination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing or, if the child has been separated from the parent for a long period of time, there must be a showing of a likelihood of future neglect by the parent." (quoting *In re R.L.D.*, 375 N.C. 838, 841, 851 S.E.2d 17 (2020)). Therefore, we treat Finding 82 as a Conclusion of Law. *See In re D.A.A.R.*, ¶ 38 (treating grounds for termination as conclusions of law for purposes of review). Since Mother already separately argues "[t]he trial court erred in terminating [her] parental rights to each of her two children based on abuse or neglect," we will review Finding 82 below when we discuss that argument.

¶ 78        Although Mother does not include similar statements about the remaining Findings of Facts she challenges being Conclusions of Law, Findings 83, 85, and 86 are also Conclusions of Law. Finding 83 focuses on the "probability neglect will be repeated" and Findings 85 and 86 concern Mother and Father "willfully" leaving Ken and Mark in placement outside the home and "willfully fail[ing] or refus[ing]" to "complete court ordered services and services on the case plan" such that they did not make "reasonable progress under the circumstances to correct the conditions that led to the juveniles' removal." Finding 83 thus addresses the same legal question as Finding 82, which was in reality a Conclusion of Law on the ground for adjudication

in § 7B-1111(a)(1). Similarly, Findings 85 and 86 use language that mirrors the ground for termination in § 7B-1111(a)(2): "The parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile." N.C. Gen. Stat. § 7B-1111(a)(2). Therefore, they are Conclusions of Law as well under *In re D.A.A.R.*, ¶ 38. As with Finding 82, we address these Findings below when discussing Mother's challenges to the trial court's adjudication on the grounds of abuse or neglect and of willful failure to make reasonable progress.

¶ 79    Finding of Fact 87 states:

> The court has pleaded and begged for information as to what happened to [Ken]. It remains unexplained. The [M]other has participated in services that do not address the reason the children came into care. Presented with the risk of substantial death, with these two children, the parents were supposed to protect them, and they did not protect these children. At this time, the environment the children lived in on or about November 7, 2017 through December 3, 2017 still exists. After the children have been in the care of the agency for the last three (3) years, neither the [F]ather nor the [M]other have explained the injuries.

Mother's only argument about the Finding is that it "reveal[s] the court's improper shifting of the burden of proof to Mother. Mother could not explain what she did not know," always appeared in court, and "answered every question about Ken's injuries." Mother thus only challenges the last sentence of the Finding about neither Father

nor Mother explaining the injuries.

¶ 80        Mother does not point to any place where she explained the injuries, nor could she as she acknowledges, so the trial court had competent evidence to make this Finding. The trial court also made other Findings recounting how it did not have an explanation of all of Ken's injures. For example, it incorporated its Findings of Fact from the October 2020 Order ceasing reunification efforts that we recounted above. The trial court also explicitly found Mother gave sworn testimony that she could not explain the injuries but believed Father caused them:

> At the termination hearing, the Mother . . . gave sworn testimony and was asked specifically if she had any explanation for each of [Ken]'s conditions as he was presented to the hospital on December 3, 2017. Mother testified that she had no explanation for any of the injuries except that she believed the Father was the cause and she believed his explanation in his email on May 13, 2020.

¶ 81        But we appreciate Mother's argument is not that Finding 87 is unsupported by the evidence, as a traditional challenge to a finding of fact would be, but rather she challenges how the trial court used her lack of explanation of Ken's injuries. Essentially, she argues she was required to prove a negative, and "[t]he law generally does not require a party to prove a negative . . . ." *Ochsner v. N.C. Department of Revenue*, 268 N.C. App. 391, 410, 835 S.E.2d 491, 504 (2019). And in cases involving this type of non-accidental injuries to a baby, there is often no direct evidence of what happened. The baby cannot tell what happened, and there was no witness to the

events causing the injuries. Trial courts must often make these very difficult and momentous decisions based upon circumstantial evidence and evaluation of credibility and weight of the evidence available.

¶ 82    While Mother is correct DSS has the burden of proof in the adjudication proceeding, *see, e.g., In re A.E.*, ¶ 13 (noting petitioner bears burden of proof at adjudication stage of termination of parental rights proceeding); N.C. Gen. Stat. § 7B-1111(b) ("The burden in these proceedings is on the petitioner or movant to prove the facts justifying termination by clear and convincing evidence."), the trial court here did not shift that ultimate burden to Mother. Rather, the trial court addressed Mother's lack of explanation here because it was relevant to its consideration of two grounds for terminating parental rights DSS alleged, namely Mother's abuse or neglect of the children and her willful failure to make "reasonable progress . . . in correcting those conditions which led to the removal of the juvenile." N.C. Gen. Stat. § 7B-1111(a)(1)–(2). As we discuss more below when we address the abuse or neglect termination ground, the lack of explanation relates to neglect or abuse because it speaks to the likelihood of future neglect or abuse. *See In re D.W.P.*, 373 N.C. at 339–40, 838 S.E.2d at 405–06 (explaining a failure to understand how child was injured helped support "the trial court's conclusion that the neglect is likely to reoccur"). The lack of explanation also touches Mother's reasonable progress, or lack thereof, because the trial court repeated its explanations, as recounted above, of how her

parental capacity evaluation did not address its referral questions and added the evaluation "failed to fully, objectively and adequately address the conditions that led to the removal of the children from the home." Thus, the trial court's focus on Mother's lack of explanation did not shift the burden to her but rather helped it evaluate whether DSS had met its burden as to the grounds for adjudication.

¶ 83    Mother's final challenge to a Finding of Fact is to Finding 88, which states:

> That on or about July 7, 2020 the court entered an order eliminating reunification as a permanent plan and ceasing further reunification efforts with the Respondent Parents. The court finds the following facts would continue to support a finding that further reunification efforts would clearly be unsuccessful or inconsistent with the juvenile's health or safety:
>     a. Mother . . . continues to have no explanation for [Ken]'s injuries which is a risk to their health and safety.
>     b. The parents have not participated in any other services since the July 7, 2020 hearing which directly address the reasons the children were removed, their safety or her accountability for [Ken]'s condition as he was presented on December 3, 2017.
>     c. There has been no substantial change in circumstances since the entry of the July 7, 2020 permanency planning order and the court re-adopts the findings of fact from that order and finds that they were providently entered with regard to the issue of elimination of reunification.
>     d. Respondent Father was convicted of a felony assault that resulted in a serious bodily injury of [Ken] and as a condition of his conviction, he is prevented from having contact with his children.

Within this long Finding, Mother specifically argues she "accepted and believed Father was responsible for Ken's injuries." She also contests the court's determination of no substantial change in circumstances since entry of the 7 July 2020 permanency planning order. We address each contention in turn.

¶ 84 As to her first contention, Mother is correct she testified she believed Father's explanation that he dropped Ken. The trial court found as much in unchallenged Finding 46. But the trial court also made other Findings indicating Mother's belief of Father's explanation was not sufficient. First, the trial court made an unchallenged Finding Father's email "ha[d] no weight and there [was] no credibility to it." Second, the trial court made unchallenged Findings that Father's explanation could not explain the full extent of the injuries. In fact, Mother's own medical expert even rejected the idea Father accidentally dropping Ken once could explain any condition beyond the skull fractures. The trial court's Finding 88(a)—its last adjudicatory Finding—took into account all of these previous, unchallenged and therefore binding, Findings of Fact. Thus, when the trial court found Mother continues to have no explanation, it in essence found Mother had no *reasonable* or even *medically defensible* explanation for Ken's injuries, and Mother could not credibly believe Father's explanation since his email did not account for the full extent of the injuries. That sort of credibility determination is within the trial court's purview, and we cannot disturb it on appeal. *See In re A.R.A.*, 373 N.C. 190, 196, 835

S.E.2d 417, 422 (2019) (explaining "it is well-established that a district court has the responsibility to pass upon the credibility of the witnesses and the weight to be given their testimony and the reasonable inferences to be drawn therefrom" (quotations, citations, and alterations omitted)).

¶ 85        Mother's belief in Father's emailed explanation also contradicts her own explanation of events. Specifically, Father's email said he dropped Ken at a time when Mother was not home. But, as the trial court found in an unchallenged Finding of Fact, Mother repeatedly testified from the initial disposition hearing to the termination hearing that she was "in the home caring for" Ken and Mark "*continuously*" from when Ken initially came home from the hospital to when he was admitted in December 2017 with the serious injuries and conditions at issue here. (Emphasis added.) Mother could not have been both at home continuously as she testified and also not home when Father dropped Ken as Father's email she believed explained. This discrepancy again further reinforces the trial court's determination Mother's understanding of the harm that came to Ken was not *reasonable*.

¶ 86        Mother also argues "[t]he findings in the July 7 permanency planning order show changed circumstances in favor of Mother" and otherwise contests Finding 88's statement there has not been a substantial change in circumstances since that order such that the trial court "providently" ceased reunification efforts. To a large extent we have already rejected this argument above when we addressed why the trial court

did not believe, in the October 2020 Order ceasing reunification, that circumstances changed in favor of Mother to the extent she now argues. To the extent it was unclear before, the trial court also made further unchallenged Findings on why it discounted the parental capacity evaluation and Mother's parenting classes. The trial court found:

> 37. As to the parenting capacity evaluation, there is no change of circumstances presented at the termination hearing and no new evidence presented as to any updated opinion of Dr. Harris Britt. Because Dr. April Harris-Britt did not take into consideration the Duke medical records (8,000 pages of medical records on disc – Petitioner's Ex. 3) or this court's prior adjudicatory findings pertaining to [Ken]'s injuries set forth in the June 25, 2018 Adjudication Order, *her original evaluation failed to fully, objectively and adequately address the conditions that led to the removal of the children from the home.*
> . . . .
> 40. *At the time of the termination hearing, neither the Mother . . . or the Father . . . had engaged in any parenting class which fully and completely addressed the medical and safety reasons that the child [Ken] came into care, especially the facts that were of the most concern to this court to include [Ken]'s low blood sugar/hypoglycemia, low body temperature and cachectic (wasted away) appearance at the time of his admission in addition to [Ken]'s other brain injuries, fractures and retinal hemorrhages.* The court's concern for the physical safety of [Ken], and [Mark] as a sibling in the home, was not alleviated by the testimony or the letter submitted by Ms. Lea Ray [the parenting class witness] because this was not covered in her courses and there was not any other evidence of any other services which addressed this concern.

(Emphasis added.) While Mother correctly states the court did not require any other

services since July 2020, Mother also failed to address the trial court's concerns about the services she had undertaken and their inadequacy.

¶ 87 Mother's other two changed circumstances also do not convince us the trial court's Finding of no *substantial* changed circumstances was unsupported by the evidence. First, Mother indicates she "pursued restoration of her visitation." While true, she did that before the trial court entered its October 2020 Order ceasing reunification efforts, so no change happened between the October 2020 Order and the termination of parental rights, especially considering the October 2020 Order ordered visitation remain suspended. Second, while Mother correctly points out the criminal charges against her were dismissed, the trial court could still reasonably decide how much weight to give that and determine if it was a substantial change in circumstances within the leeway provided by the abuse of discretion standard of review for cessation of reunification efforts that Finding 88 addresses. *See In re J.H.*, 373 N.C. at 267–68, 837 S.E.2d at 850 (explaining a dispositional order of an abuse, neglect, and dependency proceeding is reviewed for abuse of discretion and an abuse of discretion only occurs when the trial court has failed to make a reasoned decision). As such, we reject Mother's challenges to Finding 88.

¶ 88 We have now addressed all of Mother's challenges to Findings of Fact. We determine Findings 82–83 and 85–86 were in reality Conclusions of Law on the grounds for termination of parental rights, so we discuss those challenges below with

our review of those grounds. We also find clear, cogent, and convincing evidence supports Findings 87 and 88, so we reject Mother's challenges to those Findings.

**C. Termination on Abuse or Neglect Ground**

¶ 89     Turning to the legal grounds for termination, Mother argues "[t]he trial court erred in terminating [her] parental rights to each of her two children based on abuse or neglect." Specifically, Mother contends "[t]he evidence and findings were insufficient to show a reasonable likelihood Mother would neglect or abuse Ken if he was returned to her custody" because she "fully complied with and completed her case plan" and because the trial court failed to "address any clear and convincing evidence of changed circumstances of a substantial risk of abuse or neglect by Mother at the time of the termination hearing." As to Mark, Mother specifically asserts the neglect adjudication "is based on the circumstances relating to Ken's abuse or neglect in 2017" and "[t]here are no supported findings establishing the presence of other factors with a nexus to Mark or to the likelihood he would be neglected by Mother if his custody was returned to her." We provide a general overview of the relevant law and then address the adjudication of each child.

¶ 90     Relevant to these arguments by Mother, the trial court determined grounds exist to terminate Mother's parental rights under North Carolina General Statute § 7B-1111(a)(1). Under § 7B-1111(a)(1):

The court may terminate the parental rights upon a finding

of one or more of the following:

> (1) The parent has abused or neglected the juvenile.
> The juvenile shall be deemed to be abused or
> neglected if the court finds the juvenile to be an
> abused juvenile within the meaning of G.S. 7B-101
> or a neglected juvenile within the meaning of G.S.
> 7B-101.

N.C. Gen. Stat. § 7B-1111(a)(1).  The trial court specifically determined both parents

"have abused [Ken] and neglected both the juveniles."

¶ 91        Under North Carolina General Statute § 7B-101, the definitions of abused

juvenile and neglected juvenile in effect at the time the trial court terminated

parental rights were, in relevant part:

> (1) Abused juveniles.--Any juvenile less than 18 years of
> age (i) who is found to be a minor victim of human
> trafficking under G.S. 14-43.15 or (ii) whose parent,
> guardian, custodian, or caretaker:
> a. Inflicts or allows to be inflicted upon the juvenile a
> serious physical injury by other than accidental means;
> b. Creates or allows to be created a substantial risk of
> serious physical injury to the juvenile by other than
> accidental means;
> . . . .
> (15) Neglected juvenile.--Any juvenile less than 18 years of
> age . . . (ii) whose parent, guardian, custodian, or caretaker
> does not provide proper care, supervision, or discipline; or
> . . . who lives in an environment injurious to the juvenile's
> welfare . . . . In determining whether a juvenile is a
> neglected juvenile, it is relevant whether that juvenile lives
> in a home where another juvenile has died as a result of
> suspected abuse or neglect or lives in a home where
> another juvenile has been subjected to abuse or neglect by
> an adult who regularly lives in the home.

N.C. Gen. Stat. § 7B-101(1), (15) (eff. 1 Dec. 2019 to 30 Sept. 2021).[6]

¶ 92 As our Supreme Court has recently explained,

> Generally, "[t]ermination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing." *In re D.L.W.*, 368 N.C. 835, 843, 788 S.E.2d 162, 167 (2016) (citing *In re Ballard*, 311 N.C. 708, 713–15, 319 S.E.2d 227, 231–32 (1984)). However, "if the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent." *Id.* at 843, 788 S.E.2d at 167.

*In re J.J.H.*, 376 N.C. 161, 167, 851 S.E.2d 336, 341–42 (2020) (block quoting *In re J.O.D.*, 374 N.C. 797, 801–02, 844 S.E.2d 570, 575 (2020)). The trial court is required "to evaluate the likelihood of future neglect on the basis of an analysis of any 'evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing.'" *In re N.B.*, 377 N.C. 349, 2021-NCSC-53, ¶ 12 (quoting *In re Z.V.A.*, 373 N.C. 207, 212, 835 S.E.2d 425, 430 (2019)). "Thus, when a child has

---

[6] The definition of neglect changed shortly after the trial court entered its order terminating parental rights. *See In re M.K.*, ¶ 32 n.4 (summarizing changes). The trial court here found Mother and Father neglected Mark and Ken "by creating an environment which was injurious to the juveniles' welfare and by failing to provide proper care and supervision of the juveniles" which tracks with the new statutory language: "(15) Neglected juvenile.--Any juvenile less than 18 years of age . . . (ii) whose parent, guardian, custodian, or caretaker does any of the following: a. Does not provide proper care, supervision, or discipline. . . . . e. Creates or allows to be created a living environment that is injurious to the juvenile's welfare." N.C. Gen. Stat. § 7B-101(15) (eff. 1 Dec. 2021); *see also* N.C. Gen. Stat. § 7B-101(15) (eff. 1 Oct. 2021 to 30 Nov. 2021) (including same relevant language with different subsection numbering).

been separated from their parent for a long period of time, the petitioner must prove (1) prior neglect of the child by the parent and (2) a likelihood of future neglect of the child by the parent," *In re D.W.P.*, 373 N.C. at 339, 838 S.E.2d at 405, based on an analysis of any evidence of changed circumstances between the time of neglect and the termination hearing.

¶ 93          Here, Mother's arguments only focus on the likelihood of future neglect as to both Ken and Mark.  We also note the trial court made an unchallenged Finding of Fact that Mother had previously consented to all the facts that led to an adjudication in an abuse, neglect, and dependency proceeding of Ken as abused and both Ken and Mark as neglected.  *See In re J.J.H.*, 376 N.C. at 167, 851 S.E.2d at 341–42 (noting trial court finding children had previously been adjudicated neglected immediately after setting out the two required steps when children have been separated from their parents for a time before the termination proceeding).  Thus, we examine only the likelihood of future neglect.

¶ 94          The trial court's Conclusion of Law for § 7B-1111(a)(1) states:

> That grounds exist to terminate the parental rights of the Respondents [Mother] and [Father] as to the juveniles [Mark] and [Ken] pursuant to N.C. Gen. Stat. § 7B-1111(a)(l) in that both the Respondents have abused [Ken] and neglected both the juveniles by creating an environment which was injurious to the juveniles' welfare and by failing to provide proper care and supervision of the juveniles. There is a reasonable probability that such abuse and neglect would be continued and would be repeated if

the juveniles were to be returned to the care, custody, or control of the Respondents [Mother] and [Father], jointly and severally.

¶ 95    As explained above, some of the trial court's ultimate Findings of Fact, which we treat as Conclusions of Law, explain its reasoning for this Conclusion in more detail. *See In re K.L.T.*, 374 N.C. 826, 845, 845 S.E.2d 28, 42 (2020) (treating ultimate findings made in support of conclusion of law under § 7B-1111(a)(1) as conclusions of law that need to be supported by findings of fact). Specifically, Findings 82 and 83 explain why the trial court determined "[t]here is a reasonable probability that such abuse and neglect would be continued and would be repeated if the juveniles were to be returned to the care, custody, or control" of Mother and Father. Findings 82 and 83 provide:

> 82. At the time of this termination hearing, the Petitioner demonstrated by and through the evidence presented that the conditions rising to the level of neglect existed during the pendency of the termination action. There is no change in the safety risk to the children. There continues to be no explanation for [Ken]'s injury and medical condition as it existed on December 3, 2017. This continues to present a significant safety risk for [Mark] and [Ken] should they be returned to the care of either parent. Returning these children to their parents is a risk that this court cannot afford to take. There is a likelihood of repetition of neglect and abuse if the juveniles were returned to the home of the Respondents based upon the findings of fact herein.

> 83. Respondent Mother['s] . . . and Respondent Father['s] . . . failure to adequately and timely address the issues that led to the removal of the juveniles from the home

constitutes neglect. That failure to adequately and timely address the neglectful behaviors, renders the Respondents incapable of providing adequate care and supervision of the juveniles. The probability that the neglect will be repeated and said incapability will continue in the future is high given the failure of the Respondents to address and alleviate the issues.

¶ 96 The trial court's unchallenged, and therefore binding, Findings of Fact support the challenged ultimate Findings 82 and 83. As to Finding 82, the trial court repeatedly emphasized the lack of complete explanation for Ken's injuries and condition when he was admitted to the hospital as well as the trial court's concern about such lack of explanation. First, the trial court specifically incorporated Findings of Fact 33–39 and 53–57 from its October 2020 Order ceasing reunification efforts, and those Findings, as we have already explained, recount how the trial court was concerned the parents had not been able to explain *all* of Ken's conditions when admitted because the Father's admission he dropped Ken only explained some of the injuries.

¶ 97 The trial court then expanded upon its previous Findings and noted additional testimony received at the termination hearing. As to Father's emailed explanation, the trial court specifically found Father was being "untruthful" and "his email ha[d] no weight and there [was] no credibility to it." The trial court also noted how both medical experts who testified, including Mother's expert, determined most or all of Ken's injuries were non-accidental and Father's email explanation of accidentally

dropping Ken did not change their opinions because it could only explain one of the head injuries, not the full spectrum of injuries and conditions Ken presented with when admitted to the hospital. The trial court again noted Mother believed Father's email about dropping Ken and came to believe Father intentionally hurt Ken, but the trial court explained Father's explanation for how he hurt Ken, i.e. a single drop, whether intentional or not could not explain all Ken's brain and head injuries based on testimony from Mother's own expert. Further, as we explained above, Mother's own testimony she was constantly present with the children contradicted Father's email in which he said Mother was not home. Combined with the trial court's rejection of Mother and Father's prior explanations from its October 2020 Order, the trial court made clear in these unchallenged Findings of Fact why it did not credit any of the explanations proffered for Ken's injuries. As a result, the trial court had still received no explanation for Ken's injuries, thereby supporting that part of Finding 82.

¶ 98    As to the other part of Finding 82, the trial court's Findings linked the injuries and conditions to a period of time when Mother and Father were the sole caretakers. Specifically as to Mother, the trial court noted she cared for Ken and Mark "continuously from the time [Ken] came home from the hospital on November 7, 2017 through December 3, 2017," when Ken was admitted to the hospital again. The trial court also explained how the injuries most likely occurred during a period of time

between 30 November and 3 December because Ken had an doctor's appointment on 30 November where he did not have any of the injuries. As such, at least one of the parents must have been the cause of the injuries and conditions, leading to the safety risk of returning the children to the parents discussed in Finding 82. The trial court's Findings on the continued lack of explanation of the injuries support its determination the safety risk has not changed since that time when Ken's injuries and conditions were caused.

¶ 99        Mother makes several arguments against Finding 82. First, she argues the trial court had no evidence of neglect toward Mark specifically, which we address below when discussing whether the trial court's overall Conclusion of Law was properly supported. Mother next contends "[t]here was a positive change in the safety risk based on the parenting evaluations and the completion of her case plan." We address this argument below too because Finding 83—and Mother's challenge to it—concerns Mother's compliance with her case plan, or lack thereof, as evidence of neglect.

¶ 100        Mother's only other argument against Finding 82 specifically is that Ken's premature birth and "Father's admitted guilt" explain Ken's condition. The other unchallenged Findings of Fact reject Mother's proffered explanations. As we already explained, medical experts, including Mother's own expert, testified Father dropping Ken, as he admitted to, could not explain the full spectrum of Ken's injuries and

conditions. The trial court also made unchallenged Findings that implicitly ruled out premature birth as a cause. For example, the trial court found providers ruled out "other possible medical explanations" for Ken's conditions, and experts from both sides explained Ken's injuries were caused by "non-accidental trauma."

¶ 101        Amicus North Carolina Coalition Against Domestic Violence ("the Coalition") also argues the trial court was wrong in Finding 82 to "rel[y] heavily on a finding that [Mother] has no clear explanation for [Ken]'s injuries leading to the removal of the children." Specifically, the Coalition contends Finding 82 "conflate[s] an explanation of the events leading to [Ken]'s injuries with a reduction in safety risk for the children" and "relies heavily on an inference that [Mother] either participated in or condoned any abuse leading to [Ken]'s injuries." This argument is part of the Coalition's broader argument "the trial court's errors may retraumatize domestic violence survivor-parents and children in the child welfare system," which comes after its more general point "effective responses to domestic violence in the child welfare system are necessary to ensure the health and safety of children." (Capitalization altered.)

¶ 102        We agree with the Coalition's first overarching point that "effective responses to domestic violence in the child welfare system are necessary to ensure the health and safety of children," (capitalization altered), but we do not agree with its interpretation of the trial court's repeated emphasis on the failure to explain Ken's

injuries. As to the connection between the lack of explanation for Ken's injuries and conditions and the safety risk to the children, we have explained above how the trial court included numerous Findings about its concern with the lack of explanation of Ken's injuries and condition. Caselaw also demonstrates why the lack of explanation can be so important. In a case the Coalition acknowledges is relevant to this consideration, our Supreme Court explained a parent's "refus[al] to make a realistic attempt to understand how [her child] was injured" can help support a "trial court's conclusion that the neglect is likely to reoccur." *In re D.W.P.*, 373 N.C. at 340, 838 S.E.2d at 406. The *In re D.W.P.* Court inferred if a parent is not able to explain how their children were harmed before, there is a risk the children will be harmed the same way again if returned to the parent's custody, and that is a risk our courts are not required to take. *See id.*, 373 N.C. at 339–40, 838 S.E.2d at 406 (explaining the paramount importance of child safety before drawing the conclusion in the previous sentence). The trial court here permissibly drew the same inference explaining in Findings 87 and 88, which we have found support for above, the lack of explanation of Ken's injuries means there is a continued "risk to [both children's] health and safety."

¶ 103     As to the Coalition's other contention, the trial court was not inferring Mother participated in or condoned abuse and it need not have. The trial court made clear it understood Mother "believes the Father intentionally hurt" Ken. The Findings

regarding a lack of explanation instead turned on Mother's lack of recognition of the medical impossibility of Father's proffered explanation causing all the conditions Ken presented with at the hospital. The trial court also did not need to draw such an inference because the definition of neglect includes "liv[ing] in an environment injurious to the juvenile's welfare," and neglect can include failing to prevent injuries like the ones here. N.C. Gen. Stat. § 7B-101(15) (eff. 1 Dec. 2019 to 30 Sept. 2021); *see In re Y.Y.E.T.*, 205 N.C. App. at 127–29, 695 S.E.2d at 522–23 (explaining, in a case where the trial court could not determine who caused a child's non-accidental injuries and terminated parental rights on the grounds of abuse and neglect, the trial court permissibly found both parents responsible because they either "directly caused the injury by inflicting the abuse or *indirectly caused the injury by failing to prevent it*" (emphasis added)). This reflects the broader recognition "[t]ermination of parental rights proceedings are not meant to be punitive against the parent,"— which might lead to an increased focused on individual culpability—"but to ensure the safety and wellbeing of the child." *In re D.W.P.*, 373 N.C. at 340, 838 S.E.2d at 406 (citing *In re Montgomery*, 311 N.C. at 109, 316 S.E.2d at 252). As a result, we reject the Coalition's challenge to Finding 82.

¶ 104    We also note the trial court made twelve unchallenged Findings of Fact in its adjudication order in the termination of parental rights proceeding that addressed domestic violence, and most notably made an unchallenged Finding there was "no

evidence of domestic violence occurring between the parents before the filing of the petition" for abuse, neglect, and dependency. Mother testified to as much; in an unchallenged and therefore binding Finding, the court noted during the termination hearing, "[M]other testified that there was no domestic violence between her and the [F]ather prior to their DSS involvement." And the first mention of domestic violence between the parents in the record before us, namely the strangulation incident from Fall of 2018, does not appear until the 10 February 2020 hearing that led to the October 2020 Order, which is over two years after the incident that led to the children's removal from the home.[7]

¶ 105    We also reject Mother's argument the trial court erred "in refusing to allow testimony or reports from Dr. Parker and Attorney McCool as expert witnesses related to domestic violence." First, we note the trial court heard testimony from both witnesses as described in its unchallenged Findings of Fact. The trial court, in unchallenged Findings, explained it allowed Dr. Parker to testify as a "fact witness" rather than an expert because of her lack of full licensure and summarized her

---

[7] In the June 2018 hearings that led to the August 2018 initial disposition order, the trial court received into evidence a text in which Father said when not high on marijuana he was "a very negative, abusive and ugly person." Aside from generically using the word "abusive," this does not give any insight into the nature, extent, or timeline of the abuse. Notably, the trial court did not make any additional Findings on domestic violence in the two subsequent permanency planning and review orders and only discussed the subject again in the October 2020 Order.

testimony. As to McCool, the trial court, again in an unchallenged Finding, explained it "accepted her as an expert in" the field of "victimology and domestic violence advocacy in the law." The trial court only excluded testimony from McCool because "intimate partner violence [was] not a fact in issue because it [was] not a reason or condition which caused the removal of the children." It also found Mother's therapy with Dr. Parker did not assist Mother "in alleviating the conditions or reasons for removal of the children" for the same reason.

¶ 106      This case is not one where there was a history, report, or even suspicion of domestic violence before DSS removed the children from the home, so, as the trial court found, domestic violence did not play a role in the removal of the children from the home. As a result, we reject both Mother's and Amicus Coalition's arguments about domestic violence as they relate to the specific facts in this specific case.

¶ 107      Turning to Finding 83, the trial court's unchallenged Findings of Fact provided ample support for its conclusion the parents, and Mother specifically, had failed to "address and alleviate" the conditions that brought Mark and Ken into DSS custody. The court again recounted Mother's case plan from the original abuse, neglect, and dependency proceeding, as we addressed in detail above in Mother's challenge to the October 2020 Order. The trial court then incorporated its Findings 58–62 from the October 2020 Order that recounted Mother's efforts up to the time of that order. Those Findings from the October 2020 Order explained how the trial court did not

credit Mother's parental capacity evaluation because it did not address the lack of explanation for Ken's injuries and how the trial court did not find Mother's parenting class sufficient because it was "limited to childproofing the home and discussion of child health as in what to do if the child is sick or injured."

¶ 108        In the order terminating parental rights, the trial court made additional Findings updating Mother's efforts, or lack thereof, on those two fronts and further explained why it did not find her previous efforts sufficient.  On the parenting capacity evaluation, the trial court noted "there is no change of circumstances" because the evaluator did not give an updated opinion and the "original evaluation failed to fully, objectively and adequately address the conditions that led to the removal of the children from the home."  As to the parenting class, the trial court also found no change because the parenting class teacher offered no updated opinion and neither parent took additional parenting classes.  The trial court then further explained its determination the previous parenting class was inadequate for the purpose of showing the parents were making progress towards addressing the conditions that led to DSS involvement:

> At the time of the termination hearing, neither the Mother
> . . . or the Father . . . had engaged in any parenting class
> which fully and completely addressed the medical and
> safety reasons that the child [Ken] came into care,
> especially the facts that were of the most concern to this
> court to include [Ken]'s low blood sugar/hypoglycemia, low
> body temperature and cachectic (wasted away) appearance

> at the time of his admission in addition to [Ken]'s other
> brain injuries, fractures and retinal hemorrhages. The
> court's concern for the physical safety of [Ken], and [Mark]
> as a sibling in the home, was not alleviated by the
> testimony or the letter submitted by [the parenting class
> teacher] because this was not covered in her courses and
> there was not any other evidence of any other services
> which addressed this concern.

These Findings thus provide ample support for ultimate Finding 83 that parents had not addressed the issues that led to the juveniles' removal from the home, thereby constituting neglect.

¶ 109      Mother argues she completed her case plan and thereby showed the progress she needed to show. As we have explained when rejecting Mother's argument that the trial court erred in ceasing reunification efforts, the trial court took a different view of Mother's efforts than Mother takes. The trial court explained extensively— even more so in this termination order than in the October 2020 Order ceasing reunification—why Mother did not adequately address its concerns, and given we only review whether the Findings of Fact support ultimate Findings we treat as Conclusions of Law, we reject her arguments. *See In re M.K.*, ¶ 12 (explaining standard of review for Conclusions of Law). Mother's arguments about compliance with her case plan as of the date of the termination proceeding are also particularly poorly received because she already had the benefit of the trial court's order ceasing reunification efforts from October 2020 where it specifically told her why and how it

did not think her parental capacity evaluation and parenting class sufficiently addressed the reasons for DSS involvement. Even if Mother had previously believed her parental capacity evaluation and parenting class were sufficient, she was on notice the trial court believed she needed to undertake additional efforts by the time of the termination proceeding.

¶ 110        Finally, based upon these ultimate Findings, the trial court also had a legally sufficient basis for its conclusion this amounted to a likelihood of future neglect, as it was required to find since Mother had been separated from Mark and Ken prior to the termination proceeding. *In re D.W.P.*, 373 N.C. at 339, 838 S.E.2d at 405. As we explained above when analogizing to termination of parental rights cases when discussing cessation of reunification efforts, our courts have repeatedly upheld trial court orders terminating parental rights on the grounds of the likelihood of future neglect when parents have been unable to explain children's past injuries. *E.g.*, *In re D.W.P.* 373 N.C. at 339–40, 838 S.E.2d at 405–06 (summarizing facts and then explaining, "Respondent-mother acknowledges her responsibility to keep David safe, but she refuses to make a realistic attempt to understand how he was injured or to acknowledge how her relationships affect her children's wellbeing. These facts support the trial court's conclusion that the neglect is likely to reoccur if the children are returned to respondent-mother's care."). For example, in *In re Y.Y.E.T.*, this Court found the parents' "refusal to accept responsibility for the child's injury

indicate[d] that the conditions which led to the child's initial removal from [their] home ha[d] not been corrected" and thus "repetition of abuse or neglect [was] probable." *Id.*, 205 N.C. App. at 129, 695 S.E.2d at 523.

¶ 111         In the above section on cessation of reunification efforts, we explained how the trial court's Findings of Fact in that order aligned with the facts of *In re Y.Y.E.T.* and we find similar alignment here.  First, the trial court incorporated its key Findings on the lack of explanation from its October 2020 Order ceasing reunification efforts in its order terminating parental rights.  Second, the trial court made additional Findings on the continued lack of explanation and medical impossibility of Father's explanation for Ken's injuries and condition when Ken was admitted to the hospital. As such, the trial court had ample support for its Conclusion there was a likelihood of future neglect because of Mother's lack of explanation of Ken's injuries.

¶ 112         The trial court's Conclusion further properly determines both Ken and Mark can be considered neglected, via the likelihood of future neglect and abuse, based on Ken's injuries alone.  The definition of neglected juvenile explains abuse or neglect of any juvenile in the home is relevant to determining whether any other juvenile in the home is neglected:

> In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect or lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly

lives in the home.

N.C. Gen. Stat. § 7B-101(15) (eff. 1 Dec. 2019 to 30 Sept. 2021). This link reflects "the trial court need not wait for actual harm to occur to the child if there is a substantial risk of harm to the child in the home." *In re D.B.J.*, 197 N.C. App. 752, 755, 678 S.E.2d 778, 780–81 (2009) (quoting *In re T.S., III & S.M.*, 178 N.C. App. 110, 113, 631 S.E.2d 19, 22 (2006)). While the fact of prior abuse alone is not enough, this Court has recognized that a "parent's lack of acceptance of responsibility" can be a required additional factor "to suggest that the neglect or abuse will be repeated." *See In re J.C.B.*, 233 N.C. App. 641, 644, 757 S.E.2d 487, 489 (2014) (summarizing *In re P.M.*, 169 N.C. App. 423, 427, 610 S.E.2d 403, 406 (2005) as indicating a "parent's lack of acceptance of responsibility" is a sufficient additional factor). Similarly here, the trial court could rely on the prior abuse and neglect of Ken plus Mother's lack of explanation for Ken's injuries and condition when he arrived at the hospital to determine Mark was also a neglected juvenile because of the likelihood of future neglect or abuse.

¶ 113    As a result, we reject Mother's argument the adjudication as to Mark "is based on the circumstances relating to Ken's abuse or neglect in 2017" and "[t]here are no supported findings establishing the presence of other factors with a nexus to Mark or to the likelihood he would be neglected by Mother if his custody was returned to her." Mother's lack of explanation for Ken's injuries is the other factor with a nexus to

Mark because he was—and would be if returned to Mother's custody—in the same environment where Ken's injuries occurred, as the trial court recognized in ultimate Finding 82.

¶ 114    Beyond the relevance of Ken's injuries as to the neglect ground of termination for Mark, the trial court also recounted, throughout the proceedings in this case, various concerns about Mark, which the trial court took notice of when entering the adjudication order in the termination proceeding.  Specifically, in both the abuse, neglect, and dependency adjudication order, to which Mother consented, and the initial disposition order, the trial court noted the parents did not agree to have a skeletal survey done on Mark, which DSS ordered as part of a child abuse evaluation, such that one was not done.  A skeletal survey on Ken had revealed skull fractures and "rib fractures in various stages of healing" that led to the initial conclusion Ken's injuries indicated "non-accidental or inflicted trauma."

¶ 115    In addition to Mother refusing to allow a skeletal survey on Mark as part of a child abuse evaluation, the trial court also noted a series of concerns around immunizations in its initial disposition order.  Initially, Mark's foster parents signed him up for daycare, necessitating immunizations, but the parents contacted DSS "and requested they cancel" the immunization appointment.[8]  Another time, shortly after

---

[8] These immunizations were standard childhood immunizations normally required for children in school or daycare in North Carolina well before the COVID-19 pandemic.

Ken was born, the parents wanted Mark to be able to visit him and they lied to hospital staff that Mark had been immunized. In the same section of the initial disposition order, the trial court also found "the parents have a pattern of refusing medical treatment for both" Mark and Ken. While these Findings were not specifically repeated in the termination proceeding adjudication order, the court took judicial notice of them, and they demonstrate the trial court had additional concerns specific to Mark.

¶ 116    We also reject Mother's arguments as to Ken's adjudication. Mother argues "[t]he evidence and findings were insufficient to show a reasonable likelihood Mother would neglect or abuse Ken if he was returned to her custody" because she "fully complied with and completed her case plan" and because the trial court failed to "address any clear and convincing evidence of changed circumstances of a substantial risk of abuse or neglect by Mother at the time of the termination hearing." We have repeatedly explained how Mother did not fully comply with and complete her case plan to the trial court's satisfaction, most recently when addressing her challenge to ultimate Finding 83. We also note completing a case plan alone does not preclude terminating parental rights on the grounds of abuse or neglect. *See In re L.G.G.*, ¶ 34 ("[A] parent's compliance with his or her case plan does not preclude a finding of neglect." (quoting *In re J.J.H.*, 376 N.C. at 185, 851 S.E.2d 336)). As to changed circumstances, the trial court made unchallenged Findings indicating no

circumstances changed with respect to Mother's parental capacity evaluation and parenting classes, which it had previously found were insufficient. The trial court even directly used the language of changed circumstances at one point explaining: "As to the parenting capacity evaluation, *there is no change of circumstances* presented at the termination hearing . . . ."

¶ 117        Therefore, after de novo review, we determine the trial court's Findings of Fact support its ultimate Findings and Conclusion Mother's parental rights should be terminated on the grounds of neglect as to both Mark and Ken and on the grounds of abuse as to Ken pursuant to North Carolina General Statute § 7B-1111(a)(1).

**D. Termination on Willful Failure to Make Reasonable Progress Ground**

¶ 118        Mother also argues "[t]he trial court erred in terminating [her] parental rights on the ground she willfully failed to make reasonable progress" under North Carolina General Statute § 7B-1111(a)(2). Her previous challenges to Findings of Fact 85 and 86 also fit within this ground because they were in practice Conclusions of Law that mirror the language of § 7B-1111(a)(2). "Because the trial court properly terminated [her] parental rights based upon" abuse and neglect under North Carolina General Statute § 7B-1111(a)(1), "we need not address this argument." *In re L.M.M.*, 379 N.C. 431, 2021-NCSC-153, ¶ 29 (citing *In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982) and summarizing the case as follows "holding that an appealed order should be affirmed when any one of the grounds found by the trial court is supported by

findings of fact based on clear, cogent, and convincing evidence"); *see also* N.C. Gen. Stat. § 7B-1111(a) ("The court may terminate the parental rights upon a finding of one or more of the following" grounds for termination.).

¶ 119          We note in addition to Mother's arguments, some Amici contend termination on this ground was not proper.  Amicus The ACLU of North Carolina Legal Foundation argues "the trial court's failure to properly weigh the Mother's successful efforts to remedy the issues leading to the children's removal . . . raised serious due process concerns."  (Capitalization altered.) The ACLU of North Carolina later clarified this fit with § 7B-1111(a)(2) by arguing applicable law only requires reasonable progress, which invokes the language of that sub-section.  N.C. Gen. Stat. § 7B-1111(a)(2).   Amici North Carolina Justice Center and North Carolina Community Bail Fund of Durham argue "[t]he trial court did not adequately consider the impact of wealth-based pre-trial incarceration when it evaluated this case for the termination of parental rights" and then specifically indicated their arguments are under § 7B-1111(a)(2).  Amicus North Carolina Coalition Against Domestic Violence also challenges Finding of Fact 86, which we have already explained fits under this ground for termination.

¶ 120          Because we have already found the trial court properly terminated Mother's parental rights based on § 7B-1111(a)(1), we do not respond to these arguments other than to make the following observations.  First, while The ACLU of North Carolina

uses constitutional rather than statutory language, the argument is essentially the same because our statutory procedures exist to protect parents' constitutional due process rights as we explained at the outset of our analysis. *E.g.*, N.C. Gen. Stat. § 7B-100 (2021) (directing courts to interpret and construe abuse, neglect, and dependency and termination of parental rights statutes "[t]o provide procedures for the hearing of juvenile cases that assure fairness and equity and that protect the constitutional rights of juveniles and parents") In addition, we cannot address constitutional arguments which were not raised before the trial court, *see In re J.N.S.*, 207 N.C. App. 670, 678, 704 S.E.2d 511, 517 (2010) ("[I]t is well settled that a constitutional issue not raised in the lower court will not be considered for the first time on appeal." (quotations and citation omitted)), and neither Mother nor Father raised constitutional arguments as discussed by Amicus before the trial court.

¶ 121    Second, the "wealth-based pre-trial incarceration" argument advanced by Amici North Carolina Justice Center and Community Bail Fund of Durham were not raised by Mother in her briefing as reasons for the trial court's errors. In fact, Amici's argument directly contradicts Mother's argument. Amici argue the trial court failed to (properly) consider Mother's "incarceration and the subsequent impact it had on her ability to comply with the case plan and parent her children," specifically around the issue of demonstrating what she learned in parenting class by applying it in visitation. But Mother argues under § 1111(a)(2) she "complied with and fully

completed the case plan established by the court to address the removal conditions," which would necessarily include demonstrating what she learned from parenting class in visitation. Mother also does not argue on appeal that her incarceration impacted her ability to comply with the ordered services.

¶ 122        Even without that contradiction, we note the trial court recognized Mother and Father were incarcerated and could not post bond, which prevented them from being able to engage in services. In response, the trial court ordered DSS to "determine what, if any, services can be accessed in the jail and make referrals, if possible." Finally, as to this argument, we note Mother had a period of time after she was released in which she had visitation with Mark regularly, and thus to demonstrate the skills she learned in parenting class. Beyond these notes, we need not respond to Amici's arguments on the willful failure ground because we have already found the trial court properly terminated Mother's parental rights based on § 7B-1111(a)(1).

## V.        Termination of Mother's Parental Rights- Disposition Phase Exclusion of Evidence as to Best Interests

¶ 123        Mother finally argues the trial court erred when it "exclude[d] relevant evidence mandated for consideration" at the dispositional stage of the termination proceeding. Specifically, she argues the trial court erred in excluding testimony from one of her expert witnesses, Dr. Pryce, on the following topics:

> 1. Mother's bond with and sacrifices for her children, placing their needs above her own.

2. Mother's proactive parenting serving the best interests of her children.

3. The measured data indicating the potential harm, negative outcomes, and lack of benefit to children from separation from their biological parent and involvement in foster care systems; placement with kin provides better stability, fewer emotional and behavior problems, and lower reactive attachment disorders.

4. The measured importance of maintaining biological family relationships and connections, especially of African American families,

5. Data establishing that diminished bonds between juveniles and parents can be enhanced sufficiently to support reunification of the family.

We review the relevant legal background and standard of review before addressing Mother's argument.

## A. Legal Background and Standard of Review

¶ 124     Our Supreme Court has described the trial court's task at the dispositional stage of a termination proceeding as follows:

> At the dispositional stage of a termination proceeding, the trial court must "determine whether terminating the parent's rights is in the juvenile's best interest." N.C.G.S. § 7B-1110(a) (2019). In doing so, the trial court
>
> > may consider any evidence, including hearsay evidence as defined in [N.C.G.S. §] 8C-1, Rule 801, that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile. In each case, the court shall consider the following criteria and make written findings regarding the following that are relevant:
> > (1) The age of the juvenile.
> > (2) The likelihood of adoption of the juvenile.

> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
> (4) The bond between the juvenile and the parent.
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
> (6) Any relevant consideration.

> *Id.*

*In re G.G.M.*, 377 N.C. 29, 2021-NCSC-25, ¶ 22. On appeal, "[t]he trial court's determination of a child's best interests under N.C.G.S. § 7B-1110(a) is reviewed only for abuse of discretion." *Id.*, ¶ 23 (quoting *In re J.S.*, 374 N.C. at 822, 845 S.E.2d 66). "An abuse of discretion is a decision manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision." *Id.* (quoting *In re K.N.K.*, 374 N.C. 50, 57, 839 S.E.2d 735 (2020)).

When considering the specific question raised by Mother's argument—the admissibility of evidence at the dispositional stage—the trial court operates within the bounds of § 7B-1110(a), which states: "The court may consider any evidence, including hearsay evidence as defined in G.S. 8C-1, Rule 801, that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile." N.C. Gen. Stat. § 7B-1110(a). Appellate courts review the trial court's decision to admit or deny evidence at the dispositional phase of a termination of parental rights proceeding for abuse of discretion. *See In re M.Y.P.*, 378 N.C. 667, 2021-NCSC-113,

¶ 27 ("Given the wide discretion afforded the trial court in making evidentiary rulings during the dispositional hearing, even assuming that the issue had been preserved for appellate review, we would conclude the trial court did not abuse its discretion by excluding further testimony from respondent on this issue."); *see also In re R.D.*, 376 N.C. 244, 250–51, 852 S.E.2d 117, 124 (2020) ("During the dispositional stage, conversely [to the adjudication stage], the trial court retains significantly more *discretion in its receipt of evidence* and may admit any evidence that it considers to be relevant, reliable, and necessary in its inquiry into the child's best interests—even if such evidence would be inadmissible under the Rules of Evidence." (emphasis from original removed and own emphasis added)).

¶ 126        In her opening brief, Mother argues the standard of review is de novo instead of abuse of discretion because the relevancy of evidence is a question of law. First, Mother relies on *Hill v. Boone*, 279 N.C. App. 335, 2021-NCCOA-490, which is a medical malpractice case not subject to the special evidentiary rule set out in § 7B-1110(a). *Hill*, ¶ 2 (noting case is a medical malpractice action). Thus, *In re M.Y.P.* and *In re R.D.* are controlling with their abuse of discretion standard. *In re M.Y.P.*, ¶ 27, *In re R.D.*, 376 N.C. at 251, 852 S.E.2d at 124. Further, we note by her reply briefing Mother argued excluding this evidence was an abuse of discretion, stating, "Excluding it because it was not based on North Carolina research was an abuse of discretion," although at oral argument she again switched and argued the issue

should be reviewed de novo. Because prior precedent dictates abuse of discretion as the standard of review in this context, we review the trial court's exclusion of evidence from one of Mother's experts for abuse of discretion.

**B. Analysis**

¶ 127      Reviewing for abuse of discretion, we must decide whether the trial court's decision to exclude testimony from Mother's expert was "manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision." *In re G.G.M.*, ¶ 23. After some foundational testimony, certifying the witness, Dr. Pryce, as an expert in "[c]hild welfare policy and practice," extensive voir dire of Mother's expert, and arguments from the parties on whether the expert should be allowed to testify, the trial court excluded the testimony from Mother's expert because it "deem[ed] that her testimony is irrelevant":

> THE COURT: All right. Thank you. Well, the court has heard these questions, and this court follows the law. The court heard, as relates to Dr. Pryce, certainly Dr. Pryce is well-educated, and this court is not saying that she is not. However, the court finds it concerning that she was given not -- even from her own testimony, she did not think she had all the documentation on which she is premising an expert opinion. She did not ask for the court orders. She does not know about the DHHS practices in North Carolina where this incident involving the children took place. None of the research that she is relying on is from North Carolina. And so because of that, this court is going to deem that her testimony is irrelevant.

The trial court thus made a reasoned decision to exclude testimony from Mother's

expert.

¶ 128    More specifically, we can break down the trial court's reasoning into two portions to respond to the five categories about which Mother complains. First, as to Mother's categories about her bond with her children and proactive parenting serving the children's best interests, the court explained it was concerned Dr. Pryce "even from her own testimony, she did not think she had all the documentation on which she [was] premising an expert opinion" and "did not ask for the court orders." The trial court thus explained it was not accepting the expert's testimony because it did not think her opinion could help it make the best interest determination before it.

¶ 129    In *In re K.G.W.*, this Court found a trial court did not abuse its discretion when it decided to exclude, from the dispositional phase of a termination proceeding, testimony from an expert witness who did not have sufficient information on the relevant case. *See* 250 N.C. App. 62, 63, 66–67, 791 S.E.2d 540, 541, 543 (2016) (excluding testimony by psychologist expert "who had not worked with the juvenile and who lacked experience in juvenile court matters" because it "was not helpful to" the trial judge as "trier of fact"). In so ruling, the *In re K.G.W.* Court explained this aspect of a trial court's discretion rests on the trial court's ability to weigh evidence and "as an appellate court, it is not our role to determine the weight to give to the evidence." *Id.*, 250 N.C. App. at 67, 791 S.E.2d at 543; *see also* N.C. Gen. Stat. § 7B-1110(a) (permitting trial court to consider evidence a trial court "finds to be relevant,

*reliable*, and *necessary*" (emphasis added)). Here, similarly, we will not upset the trial court's discretionary decision to determine the expert's testimony would not be helpful because the expert did not have sufficient information regarding Mother or the specific facts of this case, including the trial court's orders entered prior to Dr. Pryce's review and testimony.

¶ 130 Mother's other three categories all focus on the expert's proffered testimony regarding data on the better outcomes from family placements over foster care, the importance of maintaining family bonds, "especially [in] African American families," and the ability to "enhance[]" otherwise "diminished bonds" between children and parents to allow for reunification. Amicus The ACLU of North Carolina also argues data regarding enhancing bonds to allow for reunification was relevant. And within this broad category of data, Amicus North Carolina NAACP contends Mother's expert would have provided relevant evidence of "racial disproportionality and racial bias in the child welfare system" in addition to the types of data Mother highlights in her brief.[9]

---

[9] Amicus NAACP also argues Mother was improperly "prevented from testifying about the role of race in the proceeding." (Capitalization altered.) We first note Mother did not raise this issue on appeal. Second, Mother made no offer of proof when the trial court ultimately ruled she could not testify about the role "race has played" in her "interactions" with DSS. "[A] party is required to make an offer of proof" when seeking "to preserve an argument concerning the exclusion of evidence." *In re M.Y.P.*, ¶ 25. Therefore, the argument has not been properly preserved for our review and we decline to address it.

¶ 131        The broad and general points noted by Amici are certainly worthy of note, and in fact, these points are already addressed as factors in North Carolina General Statute § 7B-1110(a).  *See* N.C. Gen. Stat. § 7B-1110(a) (listing factors relevant to best interest of the child at the termination disposition stage including "bond between the juvenile and the parent" and a catch-all provision for "[a]ny relevant consideration"); *see also In re N.C.E.*, 379 N.C. 283, 2021-NCSC-141, ¶ 19 ("[T]he trial court may treat the availability of a relative placement as a relevant consideration under N.C.G.S. § 7B-1110(a)(6)." (quotations and citation omitted)).

¶ 132        The General Assembly has also identified the "purposes and policies" for implementation of Chapter 7B, Subchapter I, N.C. Gen. Stat. § 7B-100 (2021), which includes termination of parental rights.  *See* N.C. Gen. Stat. Chapter 7B, Subchapter I, Article 11 (on termination of parental rights).  Each of the "purposes and policies" seeks to strike a balance, based on the facts of each case, between "the right to family autonomy" and the needs of the children for both protection and a "safe, permanent home:"

> This Subchapter shall be interpreted and construed so as to implement the following purposes and policies:
>
> > (1) To provide procedures for the hearing of juvenile cases that assure fairness and equity and that protect the constitutional rights of juveniles and parents;
> > (2) To develop a disposition in each juvenile case that reflects consideration of the facts, the needs and

limitations of the juvenile, and the strengths and weaknesses of the family.

(3) To provide for services for the protection of juveniles by means that respect both the right to family autonomy and the juveniles' needs for safety, continuity, and permanence; and

(4) To provide standards for the removal, when necessary, of juveniles from their homes and for the return of juveniles to their homes consistent with preventing the unnecessary or inappropriate separation of juveniles from their parents.

(5) To provide standards, consistent with the Adoption and Safe Families Act of 1997, P.L. 105-89, for ensuring that the best interests of the juvenile are of paramount consideration by the court and that when it is not in the juvenile's best interest to be returned home, the juvenile will be placed in a safe, permanent home within a reasonable amount of time.

N.C. Gen. Stat. § 7B-100.

¶ 133       The law favors family placements over foster care—*if* a family placement is available and can be done safely. *See In re N.C.E.*, ¶ 19 (stating the "extent to which" the availability of a relative placement at termination dispositional stage is relevant depends "upon the extent to which the record contains evidence tending to show whether such a relative placement is, in fact, available" (quotations and citations omitted)); *see also* N.C. Gen. Stat. § 7B-903(a1) (2021) (stating, in context of abuse, neglect, and dependency dispositions trial courts "shall" order placement with a relative who is "willing and able to provide proper care and supervision [of the juvenile] in a safe home" unless contrary to the child's best interests before discussing

out of home placements). The law recognizes the importance of maintaining family bonds for the benefit of both parent and child, if possible. Parents have a constitutionally-protected right to the care, custody, and control of their children—*if* the parents are not unfit or have not acted inconsistently with their constitutionally protected rights as a parent. *See In re E.B.*, 375 N.C. at 315, 847 S.E.2d at 670–71 ("The government may take a child away from his or her natural parent only upon a showing that the parent is unfit to have custody or where the parent's conduct is inconsistent with his or her constitutionally protected status." (quoting *Adams v. Tessener*, 354 N.C. 57, 62, 550 S.E.2d 499, 503 (2001) (alteration omitted))). But here, the trial court's responsibility was to find the facts based upon the evidence presented as to these specific children and parents and to determine the best interests of these specific children based upon those facts and the law.

¶ 134        Relevant to these data grounds, the trial court explained it did not find the expert's testimony relevant because she did "not know about the DHHS practices in North Carolina where this incident . . . took place" and "[n]one of the research" the expert relied upon "is from North Carolina." Again, these explanations represent a reasoned decision, which is the standard the trial court's exclusion must meet. *In re G.G.M.*, ¶ 23. Neither Mother nor Amici have demonstrated how research from another state and expert testimony which is not based upon in-state DHHS practices would be relevant to any determination made in this particular case. The trial judge

here did not abuse her discretion by excluding the evidence on those same grounds. *In re K.G.W.*, 250 N.C. App. at 67, 791 S.E.2d at 543.

¶ 135        Both Mother and Amicus NAACP argue the excluded data—in Mother's argument the data on outcomes in "non-kinship homes" and in NAACP's argument the research on "[t]he disproportionate and negative impact of the child welfare system on marginalized racial groups"—can still apply to North Carolina because North Carolina is not different from other states. But even if we assume the proffered data about outcomes from "non-kinship homes" and regarding the "disproportionate and negative impact of the child welfare system on marginalized racial groups" are true, neither Mother nor Amicus have demonstrated this information has any direct relevance to this case. Ken suffered serious, life-threatening abuse while in the sole care of his parents, and we have already addressed the adjudications of abuse and neglect. Statistics or studies regarding outcomes for children in non-kinship homes or disproportionate impacts on "marginalized racial groups" may be of great assistance to the policy-making branches of government when establishing the laws and procedures in child welfare cases generally, but may have no direct relevance to a particular child or family. The trial court also considered whether these studies were useful in this case, as Mother's trial counsel argued familiarity with North Carolina was not necessary because the expert's knowledge covered the whole

country.[10]   We cannot say the trial court made an unreasoned decision or a "manifestly unsupported" one in determining otherwise, and thus we reject Mother and Amicus NAACP's arguments. *In re G.G.M.*, ¶ 23.

¶ 136   The trial court did not abuse its discretion in excluding the testimony of Mother's expert during the dispositional phase of the termination proceeding.

## VI.   Conclusion

¶ 137   We reject all Mother's arguments on appeal and therefore affirm the trial court's orders.  After granting her PWC to review the issue, we conclude the trial court did not abuse its discretion in ceasing reunification efforts because it made the required Findings of Fact and a reasoned decision based on its Findings on Mother's case plan progress and the still-unexplained nature of some of Ken's injuries and ailments.  We also conclude the trial court properly determined parental rights should be terminated on the grounds of neglect as to both Mark and Ken and on the grounds of abuse as to Ken pursuant to North Carolina General Statute § 7B-1111(a)(1) because competent evidence supports the trial court's Findings of Fact and, based on our de novo review, those Findings of Fact support its ultimate Findings and Conclusions of Law.  Because the trial court only requires one ground to terminate parental rights and we found that already, we do not address the trial court's other

---

[10] As part of this argument, Mother's counsel said the expert had "seen research coming out of North Carolina," but the expert's testimony to that effect was struck following an objection.

ground of willful failure to make reasonable progress under North Carolina General Statute § 7B-1111(a)(2). Finally, the trial court did not abuse its discretion in excluding testimony from Mother's expert.

AFFIRMED.

Judges ARROWOOD and COLLINS concur.